STATE OF CONNECTICUT *v.* KEVIN KING
(SC 15510)

Callahan, C. J., and Borden, Berdon, Norcott, Katz, Palmer and McDonald, Js.

646

Argued February 18—officially released July 27, 1999

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Judith Rossi*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Herbert Carlson*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury convicted the defendant, Kevin King, of one count each of capital felony in violation of General Statutes (Rev. to 1991) § 53a-54b (5) and

(7), as amended by Public Acts 1992, No. 92-260, § 27,[1] murder in violation of General Statutes (Rev. to 1991) § 53a-54a, as amended by Public Acts 1992, No. 92-260, § 26,[2] and General Statutes (Rev. to 1991) § 53a-8, as amended by Public Acts, Spec. Sess., June, 1992, No. 92-2,[3] felony murder in violation of General Statutes (Rev. to 1991) § 53a-54c, as amended by Public Acts

[1] General Statutes (Rev. to 1991) § 53a-54b, as amended by Public Acts 1992, No. 92-260, § 27, provides: "Capital felony. A person is guilty of a capital felony who is convicted of any of the following: (1) Murder of a member of the division of state police within the department of public safety or of any local police department, a chief inspector or inspector in the division of criminal justice, a sheriff or deputy sheriff, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, an official of the department of correction authorized by the commissioner of correction to make arrests in a correctional institution or facility, or any fireman, while such victim was acting within the scope of his duties; (2) murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain; (3) murder committed by one who has previously been convicted of intentional murder or of murder committed in the course of commission of a felony; (4) murder committed by one who was, at the time of commission of the murder, under sentence of life imprisonment; (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; (6) the illegal sale, for economic gain, of cocaine, heroin or methadone to a person who dies as a direct result of the use by him of such cocaine, heroin or methadone; (7) murder committed in the course of the commission of sexual assault in the first degree; (8) murder of two or more persons at the same time or in the course of a single transaction."

[2] General Statutes (Rev. to 1991) § 53a-54a, as amended by Public Acts 1992, No. 92-260, § 26, provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[3] General Statutes (Rev. to 1991) § 53a-8, as amended by Public Acts, Spec. Sess., June, 1992, No. 92-2, provides in relevant part: "Criminal liability for acts of another. (a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. . . ."

Hereinafter, all references to § 53a-8 are to the 1991 revision as amended by Public Acts, Spec. Sess., June, 1992, No. 92-2.

1992, No. 92-260, § 28,[4] sexual assault in the first degree in violation of General Statutes (Rev. to 1991) § 53a-70, as amended by Public Acts 1992, No. 92-87, § 3,[5] and § 53a-8 and burglary in the second degree in violation of General Statutes § 53a-102,[6] and two counts of risk of injury to a child in violation of General Statutes (Rev. to 1991) § 53-21[7] and § 53a-8. The state sought

[4] General Statutes (Rev. to 1991) § 53a-54c, as amended by Public Acts 1992, No. 92-260, § 28, provides: "Felony murder. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[5] General Statutes (Rev. to 1991) § 53a-70, as amended by Public Acts 1992, No. 92-87, § 3, provides in relevant part: "Sexual assault in the first degree . . . . (a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[6] General Statutes § 53a-102 provides in relevant part: "Burglary in the second degree . . . . (a) A person is guilty of burglary in the second degree when he enters or remains unlawfully in a dwelling at night with intent to commit a crime therein. . . ."

[7] General Statutes (Rev. to 1991) § 53-21 provides: "Injury or risk of injury to, or impairing morals of, children. Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals are likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

imposition of the death penalty on the capital felony count, and the trial court conducted a separate sentencing hearing, pursuant to General Statutes (Rev. to 1991) § 53a-46a,[8] before the same jury. The jury rendered a

[8] General Statutes (Rev. to 1991) § 53a-46a provides in relevant part: "Hearing on imposition of death penalty. Aggravating and mitigating factors. (a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of . . . a capital felony, the judge . . . who presided at the trial . . . shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, including any mitigating factor set forth in subsection (g), and any aggravating factor set forth in subsection (h). . . . Such hearing shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause or, (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state.

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (h) shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the factors set forth in subsection (h) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury . . . shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and

special verdict finding that the state had established an aggravating factor and that the defendant had proven a mitigating factor. The trial court rendered its judgment of conviction in accordance with the jury verdict, and, as required by § 53a-46a (f), imposed a sentence of life imprisonment without the possibility of release on the capital felony count.[9] The trial court also sentenced the

circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

"(e) The jury . . . shall return a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor.

"(f) If the jury . . . finds that one or more of the factors set forth in subsection (h) exist and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury . . . finds that none of the factors set forth in subsection (h) exists or that one or more mitigating factors exist, the court shall impose a sentence of life imprisonment without the possibility of release.

"(g) The court shall not impose the sentence of death on the defendant if the jury . . . finds by a special verdict, as provided in subsection (e), that any mitigating factor exists. The mitigating factors to be considered concerning the defendant shall include, but are not limited to, the following: That at the time of the offense (1) he was under the age of eighteen or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution or (4) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (5) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(h) If no mitigating factor is present, the court shall impose the sentence of death on the defendant if the jury . . . finds by a special verdict as provided in subsection (e) that . . . (4) the defendant committed the offense in an especially heinous, cruel or depraved manner . . . ."

Hereinafter, all references to § 53a-46a are to the 1991 revision.

[9] For sentencing purposes, the trial court merged the defendant's convictions for murder, felony murder and sexual assault in the first degree with his capital felony conviction. See *State* v. *Chicano*, 216 Conn. 699, 725, 584

defendant to ten years imprisonment on each of the second degree burglary and risk of injury to a child counts, those sentences to run consecutively to one another and to the defendant's sentence on the capital felony count, for a total effective sentence of life in prison without the possibility of release, plus thirty years.

On appeal,[10] the defendant contends that the trial court improperly: (1) rejected the defendant's claim that the state, during jury selection, had exercised its peremptory challenges in a racially discriminatory manner; (2) excluded certain evidence in violation of the defendant's right to present a defense as guaranteed by the compulsory process clause of the sixth amendment to the United States constitution; (3) restricted the defendant's cross-examination of one of the state's witnesses in violation of the rules of evidence and the confrontation clause of the sixth amendment; (4) failed to instruct the jury that it could not convict the defendant of capital felony under § 53a-54b (5) unless the state proved that the defendant had held the victim for ransom; and (5) imposed consecutive prison terms on the capital felony count and on the second degree burglary and risk of injury to a child counts. We reject each of these claims and, therefore, affirm the judgment of the trial court.

The evidence adduced at trial revealed the following facts. In December, 1992, Gryzna Urbanski resided at 207 Winfield Drive in New Britain with her two daughters, Patricia (victim), who was fifteen years old at that time, and Justyna, who was two months shy of three

---

A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991).

[10] The defendant has appealed to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony . . . ."

years old.[11] At approximately 8 p.m. on December 20, 1992, Gryzna, who worked the night shift, left for work. The victim remained at home to care for Justyna.

At some time after 4 a.m. on December 21, neighbors of the Urbanskis were awakened by screams and the sound of a young child crying. Neighbors saw a light go on on the second floor of the Urbanski home, and observed, through the second story window, the silhouette of a person moving about. The light went out shortly thereafter. Neighbors also observed a dark red Volkswagen Jetta (Jetta) parked near the Urbanski home.

The neighbors then saw an individual inside the Urbanski home push out the screen of a second story window, toss a duffel bag out the window and jump to the ground. The individual, who was described as being approximately five feet, five inches tall and slight of build, was wearing a ski mask, dark clothes and boots, and appeared to be wearing gloves. Neighbors began converging on the scene, and the intruder, who had been running in the direction of the Jetta, changed direction to elude them. One of the neighbors flung a baseball bat at the fleeing intruder, striking him on the leg. The intruder nevertheless managed to escape.

Shortly thereafter, Officer Peter Sheldrick of the New Britain police department was dispatched to the Urbanski home. When Sheldrick arrived, he found the front and rear doors locked. He observed, however, that a basement window was missing and that a metal window frame was lying on the ground nearby. Sheldrick entered the residence through the missing window and proceeded to the first floor, where he was joined by a second police officer, Bernard Moreno. Sheldrick and Moreno then proceeded to the second floor, where they first entered Justyna's bedroom and found

---

[11] Earlier in 1992, Stanislaw Urbanski, Gryzna's husband and the father of the victim and Justyna, had gone to Poland because of immigration problems.

her in bed, awake and crying. They then proceeded to a second bedroom and forced open the door, which had been braced shut from inside the bedroom with a large piece of furniture. Upon entering the bedroom, the officers found the victim lying face down on the bed, wearing only a nightshirt that had been lifted above her hips, with a piece of duct tape over her mouth. She was unresponsive and bleeding from various wounds.

Sheldrick called an ambulance and, at approximately 5 a.m., the victim was taken to a hospital, where, after undergoing emergency surgery, she died several hours later. An autopsy revealed hemorrhaging from the superficial vessels in her head and cheeks, indicating that she had been strangled. She also had suffered cuts and abrasions on her neck and hands, stab wounds to her face and body, at least one of which had pierced her heart, and blunt force trauma injuries to her head and torso.

An investigation by the police revealed that the Jetta parked near the Urbanski home was owned by Cari Standish, the defendant's girlfriend. When the police discovered the Jetta shortly after the murder, its engine was still warm.

Standish was interviewed by the police, and explained that she had arrived at the defendant's home at 100 Pentlow Avenue in New Britain at approximately 11:30 p.m. on December 20, 1992. She parked her Jetta in front of the defendant's home and locked it. She and the defendant went to bed at about 1:30 a.m. on December 21.

When Standish awoke at approximately 6:20 a.m. on December 21, the defendant was asleep in bed beside her. Standish noticed, however, that the Jetta was no longer where she had parked it. Standish then telephoned her mother, who informed her that the police had her car and wanted to speak to her. Standish asked

the defendant if he knew anything about the Jetta's whereabouts, because he had a key to the vehicle and permission from Standish to use it. The defendant acknowledged that he had taken the Jetta during the night, and that he and a friend had broken into a house, intending to burglarize it. The defendant further stated that, while they were on the second floor, an occupant emerged from a room, saw them and screamed. According to the defendant, his friend then stabbed the occupant in the neck with a pocket knife.

The police recovered a ski mask and a pair of blood-stained gloves in the parking lot of a housing complex located along the route a person would take if traveling on foot from the Urbanski home to the defendant's home. Witnesses testified that the defendant often wore a ski mask similar to the one found near the housing complex; they also identified the blood-stained gloves as those of the defendant. DNA analysis of the blood on the gloves established that it matched the victim's blood.[12] In addition, the defendant's height and build matched the physical description of the fleeing masked intruder that the Urbanskis' neighbors had given to the police.

The police learned that the defendant had been introduced to the victim by a mutual friend, Timothy Prevo, in early December, 1992, when Prevo and the defendant visited the victim at her home. During that visit, the defendant observed the layout of the Urbanski home, along with its contents, which included a stereo and a large television set. The defendant also learned of Gryzna Urbanski's work schedule. After their visit to the victim's home, the defendant and Prevo spoke to the victim on the telephone several times. The calls

---

[12] The DNA profiling expert testified that only one person in five hundred million has blood with the same genetic characteristics as those found in the blood sample taken from the victim and the blood found on the gloves.

ceased, however, shortly before December 10, 1992, when Prevo left the state to join the United States Navy.

After the defendant's arrest, the police executed a search warrant that had been obtained for his home and seized some clothing that they found in the washing machine. Forensic tests revealed that a piece of acrylic fiber found on one of the pillows at the Urbanski home was similar to a fiber that had been taken from a sweatshirt that the police had seized from the defendant's washing machine.

The police also obtained a search warrant for samples of the defendant's bodily fluids. The warrant was executed at New Britain General Hospital, where medical personnel observed fresh scratch marks on the defendant's shoulder and chest. DNA analysis of a sample of seminal fluid that had been taken from the victim's vagina indicated that it could have come from only 1 percent of the population, including the defendant. Furthermore, human hairs found on the ski mask were similar to hair samples taken from both the victim's body and the defendant.

In addition, the defendant contacted Standish while the defendant was in custody and confided in her that Justyna had witnessed the victim's murder. The defendant also told Standish that he could gain an acquittal only by claiming that he had been overcome by rage. Finally, Daniel Begley, a prison official, overheard the defendant on the telephone explaining that Justyna had witnessed the crime, and that she would remember it for the rest of her life. Thereafter, the defendant asked Begley if Begley knew what would happen to him "for what I've done." Additional facts will be set forth as necessary.

# I

The defendant first claims that the state violated his rights under the equal protection clause of the fourteenth amendment to the United States constitution[13] by exercising three of its peremptory challenges in a racially discriminatory manner. We disagree.

Before analyzing the defendant's claims with respect to each of the three challenged venirepersons, we first summarize the applicable law. "In *Batson* [v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986),] the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution[14] in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause[15] forbids the prosecutor to challenge potential jurors solely on

---

[13] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." The defendant makes no separate and independent state constitutional claim.

[14] "The United States Supreme Court subsequently extended the prohibition against race based peremptory challenges to criminal defendants; *Georgia* v. *McCollum,* [505 U.S. 42, 59, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992)]; and to civil litigants. *Edmonson* v. *Leesville Concrete Co.,* 500 U.S. 614, 616, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991)." *State* v. *Hodge,* 248 Conn. 207, 218 n.16, 726 A.2d 531 (1999).

[15] "Discriminatory challenges implicate the equal protection rights of both the criminal defendant and the prospective juror. See generally *Powers* v. *Ohio,* 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991)." *State* v. *Hodge,* 248 Conn. 207, 218 n.17, 726 A.2d 531 (1999).

account of their race[16] . . . . *State* v. *Robinson*, [237 Conn. 238, 243–44, 676 A.2d 384 (1996)]. Relying on the rationale underlying *Batson*, the United States Supreme Court has held that gender-based challenges also are impermissible.[17] *J.E.B.* v. *Alabama ex rel. T.B.*, [511 U.S. 127, 146, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994)].

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual.[18] . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting

---

[16] We note that the defendant is entitled to raise a *Batson* claim even though he and the challenged jurors belong to different racial or ethnic groups. *Powers* v. *Ohio*, 499 U.S. 400, 402, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). In this case, the defendant is white.

[17] We recently held that the exercise of peremptory challenges based solely on a venireperson's religious affiliation also violates the federal equal protection clause. *State* v. *Hodge*, 248 Conn. 207, 245, 726 A.2d 531 (1999).

[18] "Under federal law, a three step procedure is followed when a *Batson* violation is claimed: (1) the party objecting to the exercise of the peremptory challenge must establish a prima facie case of discrimination; (2) the party exercising the challenge then must offer a neutral explanation for its use; and (3) the party opposing the peremptory challenge must prove that the challenge was the product of purposeful discrimination. See, e.g., *Hernandez* v. *New York*, 500 U.S. 352, 358–59, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991); *Batson* v. *Kentucky*, supra, 476 U.S. 96–98. Pursuant to this court's supervisory authority over the administration of justice, we have eliminated the requirement, contained in the first step of this process, that the party objecting to the exercise of the peremptory challenge establish a prima facie case of discrimination. *State* v. *Holloway*, 209 Conn. 636, 646 & n.4, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). Thus, in this state, after the party contesting the use of the peremptory challenge has raised a *Batson* claim, the party exercising the challenge must proffer a race neutral explanation for its decision to strike the venireperson from the jury array. Id., 646. In Connecticut, therefore, the party objecting to the exercise of the peremptory challenge satisfies step one of the tripartite process simply by raising the objection." *State* v. *Hodge*, 248 Conn. 207, 219 n.18, 726 A.2d 531 (1999).

the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .[19]

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race [or gender] as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]. . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the

---

[19] Thus, "our state jurisprudence differs from *Batson* only in that, under state law, we dispense with the requirement that the defendant make a prima facie showing of discrimination." *State* v. *Hodge*, 248 Conn. 207, 221 n.19, 726 A.2d 531 (1999); see also *State* v. *Robinson*, supra, 237 Conn. 245 n.6 ("[a]fter the burden shifts to the state to demonstrate that its challenges were race-neutral, the defendant's *Batson* claim is treated similarly under the state and federal constitutions" [internal quotation marks omitted]); *State* v. *Hinton*, 227 Conn. 301, 322 n.23, 630 A.2d 593 (1993) (same).

acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. The officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . . *United States* v. *Alvarado*, [951 F.2d 22, 26 (2d Cir. 1991)]. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. *Hernandez* v. *New York*, 500 U.S. 352, 365, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991); *Batson* v. *Kentucky*, supra, 476 U.S. 98 n.21; *United States* v. *Alvarado*, supra, 951 F.2d 25; *State* v. *Gonzalez*, [206 Conn. 391, 395, 538 A.2d 210 (1988)]. Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. *State* v. *Hinton*, [227 Conn. 301, 323–24, 630 A.2d 593 (1993)]; see *State* v. *Gonzalez*, supra, 406–407. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *State* v. *Hodge*, 248 Conn. 207, 218–24, 726 A.2d 531 (1999).

With these principles in mind, we now turn to the defendant's contention that, contrary to the finding of the trial court, the state purposefully discriminated on

the basis of race in using its peremptory challenges to strike three minority venirepersons from the jury panel. We reject the defendant's claim with respect to each of the challenged venirepersons.

## A

### Venireperson B.G.[20]

After the voir dire of venireperson B.G., an African-American female, the state exercised a peremptory challenge to strike her from the jury panel. The defendant raised an objection under *Batson/Holloway*; see footnote 18 of this opinion; and, in accordance therewith, the trial court instructed the prosecutor to explain his reasons for striking B.G. The prosecutor stated that he had based his decision on the fact that B.G. had indicated that she was strongly opposed to the death penalty. In particular, B.G. had stated that she "[did not] believe in the death penalty," and that she had held that view "all [her] life." She also indicated that she did not feel that the imposition of the death penalty is a fit and moral function of government, that she was "totally in opposition" to our death penalty statute and that she "would [vote to] eliminate it" if she were a legislator. Although B.G. had indicated that she could and would follow the court's instructions regarding the death penalty, and that she would not let her personal views interfere with her responsibilities as a juror, she also had indicated that she was not certain that she wanted to sit on a capital felony case in light of her opposition to the death penalty. Finally, when asked by the state whether she knew of any case in which the death penalty had been "appropriately imposed," B.G. stated that she was not aware of any such case.

After the prosecutor had explained his reasons for exercising the peremptory challenge, the trial court

[20] We use the initials of each venireperson to protect that venireperson's legitimate privacy interests.

asked defense counsel if he wished to be heard. Defense counsel indicated that he had nothing further to add.[21] The trial court, noting that B.G. had "obviously ago-nize[d] over the death penalty questions" and candidly had acknowledged that it would be difficult for her to participate in a capital felony case, concluded that the prosecutor's explanation for the peremptory challenge was "believable and forthright and justified in the record."

The defendant concedes that a prosecutor may strike a venireperson whom the prosecutor reasonably believes will be unable to follow the court's instructions concerning the sentencing phase of a capital felony case, even if that venireperson's answers do not justify a challenge for cause. The defendant nevertheless claims that, because B.G. stated that she would apply the law as instructed irrespective of her strongly held views against the death penalty, the trial court improperly concluded that the explanation proffered by the prose-cutor was not pretextual. We reject the defendant's argument.

"Once the state met its burden of producing a race-neutral explanation, it was incumbent upon the defen-dant to persuade the trial court that the state's reasons were insufficient or pretextual. To have done so, the defendant could have advanced reasons that are salient to a showing of pretext." (Internal quotation marks omitted.) *State* v. *Beltran*, 246 Conn. 268, 280, 717 A.2d 168 (1998). The defendant's failure to provide the trial court with such reasons may be treated as acquiescence in the validity of the prosecutor's explanation. Id.; see also *United States* v. *Arce*, 997 F.2d 1123, 1126–27 (5th Cir. 1993); *United States* v. *Rudas*, 905 F.2d 38, 41 (2d

---

[21] When the trial court asked defense counsel if he wished to be heard as to whether the prosecutor's reasons for striking B.G. were pretextual, defense counsel responded: "I think I've made my claim."

Cir. 1990). The record, moreover, fully supports the trial court's conclusion that, notwithstanding B.G.'s expressed willingness to follow the court's instructions, her responses gave rise to a legitimate concern that she would have difficulty putting aside her strong opposition to the death penalty in evaluating the evidence and, ultimately, in considering the claimed aggravating and mitigating factors. The defendant, therefore, has not demonstrated that the trial court's finding on this issue was clearly erroneous. Accordingly, the defendant cannot prevail on his claim that the state's exclusion of B.G. was improper.

## B

### Venireperson R.R.

The state exercised another peremptory challenge against venireperson R.R., a Hispanic male. R.R., a teacher, also described himself as an "extraordinary eucharistic minister" of the Roman Catholic faith.[22] He stated that he was opposed to the death penalty for several reasons. In particular, he explained that capital punishment is contrary to the teachings of his church, that only God has the right to take a life, that it does not serve as a deterrent and that the economic cost of implementing the death penalty cannot be justified. Although R.R. stated that he would follow the court's instructions on the death penalty notwithstanding his own personal beliefs, he also expressed reservations as to whether the sanction of death was morally proper.

The defendant raised a *Batson/Holloway* objection to the state's exercise of a peremptory challenge against R.R., and, in response, the prosecutor defended his decision on the basis of R.R.'s strong personal and religious

---

[22] R.R. explained that he was an unordained minister who, among other things, was allowed to give communion to hospital patients.

opposition[23] to the death penalty. The trial court asked defense counsel whether he wished to explain why, in his view, the prosecutor's reasons were pretextual. Defense counsel stated that he did not.

The defendant's claim concerning the state's allegedly racially discriminatory strike of R.R. is identical in all material respects to his contention that the state improperly exercised a peremptory challenge against B.G. See part I A of this opinion. For the same reasons that we rejected the defendant's claim regarding the state's allegedly improper exercise of a peremptory challenge against B.G., we reject the defendant's claim with respect to the state's exclusion of R.R.

C

Venireperson A.R.

Finally, the defendant asserts that the trial court's conclusion that the state did not exclude venireperson A.R., an African-American male, on the basis of A.R.'s race was clearly erroneous. This claim also is without merit.

During voir dire, A.R. stated his belief that African-American defendants often receive more severe sentences than white defendants for the same crimes. A.R. also expressed concern that African-American defendants are more likely to be sentenced to death than white defendants. In response to a posed hypothetical situation in which the state was constrained to drop a sexual assault charge because the rapist's confession had been obtained illegally, A.R. indicated that he would be more troubled by the fact that the confession had

---

[23] Although constitutional principles of equal protection prohibit the exercise of a peremptory challenge on the basis of a venireperson's religious *affiliation*; *State* v. *Hodge*, supra, 248 Conn. 245; a prospective juror's religious *beliefs* may render that person unsuitable for jury service in a particular case. Id.

been the product of illegality than by the fact that a guilty person had been set free. A.R. also stated that he had applied for positions with the Windsor police department and the Connecticut state police, but that he had been rejected for both positions. In addition, A.R. had failed to note his rejection from the state police on his juror questionnaire. A.R. further indicated that he was not in favor of the death penalty, primarily because of the possibility that an innocent person might be put to death.[24]

The prosecutor relied on these responses in explaining why he had decided to strike A.R. from the panel. Specifically, the prosecutor stated that he was concerned that A.R.'s views about the unfairness of certain aspects of the criminal justice system might influence his ability to remain completely impartial. The prosecutor also indicated that he intended to call as witnesses several persons employed by the Connecticut state police, and that A.R.'s failure to obtain a position with that agency could affect his objectivity with respect to the testimony of those employees.[25] Finally, the prosecutor expressed serious concerns about A.R.'s opposition to the death penalty, asserting that A.R.'s fear that an innocent person might be sentenced to death could prompt him to favor the defendant over the state.

The defendant claimed that these reasons were insufficient to establish a legitimate, nonracial basis for the state's exercise of a peremptory challenge against A.R.

---

[24] A.R. also stated that the death penalty is not a proper or moral function of government unless it is applied equally, "across the board," to similarly situated defendants in the various states. After acknowledging that not all states have capital punishment, A.R. indicated that his real concern was that a person might receive the death penalty for a crime that he or she did not commit.

[25] In explicating this reason, the prosecutor also noted that A.R. seemed to be visibly upset when he was asked about his unsuccessful efforts to obtain employment in law enforcement.

In particular, defense counsel maintained that the views expressed by A.R. could not reasonably have been interpreted as adverse to the state's interest in seating a neutral and objective jury.

After hearing from the parties, the trial court stated that, although one might conclude from A.R.'s responses that he could be fair to both the state and the defendant, one also could infer from his answers that A.R.'s personal views might adversely affect his ability to be completely fair to the state. The trial court found, therefore, that the state's exercise of a peremptory challenge against A.R. was not motivated by discriminatory considerations.

We agree with the state that the trial court's rejection of the defendant's claim that the prosecutor's reasons for striking A.R. were pretextual was not clearly erroneous. First, the prosecutor understandably was troubled by A.R.'s predisposition against the death penalty. Second, it was reasonable for the prosecutor to conclude that A.R.'s concerns about the fairness of the criminal justice system might make it difficult for him to view the state's case with complete objectivity. See *State v. Hinton*, supra, 227 Conn. 327 (distrust of judicial system's treatment of minority defendants may be valid consideration in evaluating suitability of venireperson). Finally, the fact that A.R.'s employment applications to two law enforcement agencies had been rejected gave rise to a legitimate concern that he might harbor some resentment toward the police and the prosecuting authorities.[26] We are satisfied, therefore, that the record

[26] This is especially true in light of the prosecutor's observation; see footnote 25 of this opinion; that A.R. appeared to be distressed when the subject was raised. See, e.g., *State v. Robinson*, supra, 237 Conn. 254–55 n.15 ("A prosecutor . . . may legitimately [base his or her decision to exercise a peremptory challenge] not only on answers given by the prospective juror to questions posed on voir dire, but also on the prosecutor's observations of the prospective juror. An impression of the conduct and demeanor of a prospective juror during the voir dire may provide a legitimate basis for the exercise of a peremptory challenge. . . . Thus, a prosecutor's explanation

supports our conclusion that the trial court's determination that the state did not strike A.R. on account of his race was not clearly erroneous.[27]

## II

The defendant next contends that two evidentiary rulings by the trial court violated his right to present a defense guaranteed by the compulsory process clause of the sixth amendment to the federal constitution.[28] The defendant claims that the trial court improperly precluded him from introducing into evidence: (1) the testimony of a New Britain police officer that the victim's two and one-half year old sister, Justyna, had failed to respond when shown a photographic array that included a photograph of the defendant; and (2) a pair of sneakers that the police had seized from the defendant pursuant to a search warrant. We reject these claims.[29]

that a venireperson was excluded because he or she seemed, for example, inattentive or hostile to the government, if credible, is sufficient." [Internal quotation marks omitted.]).

[27] We note that the defendant, in support of his contention that the prosecutor's reasons for striking venirepersons B.G., R.R. and A.R. were pretextual, also relies on the argument that the state failed to exercise peremptory challenges against certain other venirepersons with characteristics similar to B.G., R.R. and A.R. See, e.g., *State* v. *Hinton*, supra, 227 Conn. 325 (pretext may be shown when person of different race than challenged juror but with same or similar characteristics was not struck). The defendant, however, failed to make this claim in the trial court. Because that unpreserved component of the defendant's *Batson* claim raises undecided factual questions, the record is inadequate for appellate review. See *State* v. *Hodge*, supra, 248 Conn. 227–28.

[28] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." The defendant makes no claim under the state constitution.

[29] The defendant failed to raise these constitutional claims at trial. He nevertheless contends that the claims he raises on appeal are reviewable under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), in which we concluded that a defendant may prevail on an unpreserved constitutional claim if all of the following four conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged

Before addressing the defendant's claims, we first summarize the law that governs our analysis. "The sixth amendment right to compulsory process includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies." (Internal quotation marks omitted.) *State* v. *Carter*, 228 Conn. 412, 422, 636 A.2d 821 (1994). "When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense. . . . A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied 'mechanistically' to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . If the proffered evidence is not relevant, the defendant's right to confrontation is not affected, and the evidence was properly excluded." (Citations omitted.) *State* v. *Christiano*, 228 Conn. 456, 474, 637 A.2d 382, cert. denied, 513 U.S. 821, 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994); accord *State* v. *Bova*, 240 Conn. 210, 236, 690 A.2d 1370 (1997).

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue.

---

constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id., 239–40. We agree that the record is adequate for review, but conclude that, as to both claims, the defendant's sixth amendment right to present a defense was not violated by the exclusion of the evidence.

The defendant also asserts that the exclusion of the evidence, even if not a constitutional violation, constituted harmful error requiring a new trial. In light of our conclusion that the trial court's exclusion of the evidence was not improper, we also reject this claim.

. . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . A party is not required to offer such proof of a fact that it excludes all other hypotheses; it is sufficient if the evidence tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence *tend* to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 305, 664 A.2d 743 (1995).

Finally, "[t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion."[30] (Citations omitted; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998). We now address each of the defendant's claims in turn.

---

[30] Of course, "[i]f an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt." *State* v. *Cavell*, 235 Conn. 711, 720, 670 A.2d 261 (1996). "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." *State* v. *Marshall*, 246 Conn. 799, 812, 717 A.2d 1224 (1998).

A

The defendant first claims that the trial court improperly excluded testimony from Officer Stanley Masternak of the New Britain police department that, shortly after the homicide, he had shown the victim's sister, Justyna, a photographic array of eight white males, including one of the defendant, and that Justyna had failed to respond when Masternak asked her whether she saw the perpetrator in the array.[31] The defendant claimed that Masternak's testimony was relevant to establish that Justyna had failed to identify the defendant as the perpetrator. The trial court excluded the testimony on hearsay grounds.

"A statement made out-of-court that is offered to establish the truth of the matter contained in the statement is hearsay, and as such is inadmissible." *State v. Blades*, 225 Conn. 609, 632, 626 A.2d 273 (1993). Nonverbal conduct may also be hearsay if intended as an assertion. "If the conduct is assertive in nature, that is, meant to be a communication—like the nodding or shaking of the head in answer to a question—it is treated as a statement, and the hearsay rule applies." C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 11.2, p. 319; see also *State v. Blades*, supra, 632. However, conduct not intended as an assertion is not hearsay.

---

[31] Defense counsel made the following proffer with respect to Masternak's testimony:

"[Kenneth Simon, Defense Counsel]: I would expect that [Masternak] would say that the [photographic] array was presented to the child and the child failed to make any identification.

"The Court: What specifically did the child do?

"Mr. Simon: Nothing. Nothing. When asked . . . whether or not the person was in [the array], the child did nothing.

"The Court: The child didn't say the person's not in there, didn't say the person's in there?

"Mr. Simon: Didn't say anything. Right.

"The Court: The child did nothing?

"Mr. Simon: That's as I understand it."

*State* v. *Blades*, supra, 633. Thus, "[n]onassertive conduct such as running to hide, or shaking and trembling, is not hearsay." *State* v. *Thomas*, 205 Conn. 279, 285, 533 A.2d 553 (1987); cf. *State* v. *McCarthy*, 197 Conn. 166, 173, 496 A.2d 190 (1985).

After defense counsel had proffered Masternak's testimony, the state objected to its admission on the ground that, because defense counsel sought to treat Justyna's silence as an assertion that she could not identify the defendant, third party testimony regarding Justyna's out-of-court silence was inadmissible hearsay. In response, defense counsel maintained that Justyna's silence was nonassertive conduct and, consequently, not hearsay.[32] The trial court rejected defense counsel's argument, concluding that, because defense counsel was seeking to use Masternak's testimony to prove that Justyna could not identify the defendant, her silence was the equivalent of a nonverbal assertion that the perpetrator was not in the photographic array and, consequently, her silence was hearsay. The trial court also concluded, in the alternative, that if Justyna's silence was nonassertive conduct, it was irrelevant. Finally, the trial court noted the questionable trustworthiness of Justyna's reaction in light of her tender age and the day's traumatic events, and, furthermore, that "her actions [could] be explained a number of ways."

On appeal, the defendant seeks to amplify the argument that defense counsel made in the trial court. Specifically, he claims that the proffered evidence

[32] As the trial court had observed, the testimony of a witness—typically a police officer—regarding an out-of-court identification is inadmissible hearsay unless the declarant also testifies and is available for cross-examination. See, e.g., *State* v. *Outlaw*, 216 Conn. 492, 497–98, 582 A.2d 751 (1990). Because Justyna was not called as a witness, and, therefore, did not testify, the defendant does not dispute that Masternak's testimony regarding Justyna's response to the photographic array would not have been admissible unless her response properly may be characterized as nonassertive conduct.

regarding Justyna's failure to respond to Masternak's inquiry was nonassertive conduct and, therefore, not hearsay, because if Justyna *had* recognized the defendant in the photographic array, she likely would have exhibited fear or distress. The defendant contends that the fact that Justyna did *not* react in such a manner suggests that she did not recognize the defendant when she was shown the photographic array.

At trial, defense counsel *labeled* Justyna's conduct as nonassertive, but then acknowledged that the proffered testimony was admissible *only to establish that Justyna had failed to identify the defendant in the photographic array.*[33] At no time did defense counsel state, as the basis for this claim, that Justyna's reaction was admissible as nonassertive conduct *because she had not exhibited any fear upon being shown the array.* Thus, as defense counsel articulated the claim to the trial court, he was seeking to use Justyna's silence as a nonverbal assertion or statement. In view of the manner in which defense counsel characterized the claim, the trial court properly rejected Masternak's testimony as inadmissible hearsay.

On appeal, the defendant claims that Justyna's failure to exhibit any fear or other emotion upon viewing the photographic array was nonassertive conduct and, therefore, was admissible to establish that Justyna had not identified the perpetrator as one of the persons in the array. The defendant further claims that his inability to present Masternak's testimony regarding Justyna's reaction to the array violated his right to present a defense because it adversely affected his ability to

---

[33] Before ruling on the admissibility of Masternak's testimony, the trial court, in an effort to understand precisely the claim that the defendant was making, inquired of defense counsel: "You would be offering it to show, I presume . . . only that Justyna, age two at the time, failed to make an [identification]. Otherwise it has no relevance. Right?" Defense counsel responded in the affirmative.

establish that he was at home, asleep with his girlfriend, Standish, when the victim was killed.[34] We disagree.

Although Justyna apparently was home when the intruder entered and killed the victim, no evidence was adduced to establish that Justyna saw the perpetrator's face.[35] Indeed, the evidence established that the perpetrator emerged from the Urbanski home wearing a ski mask, and there is nothing in the record to demonstrate that he had taken off the mask while he was in the house. Moreover, the trial court reasonably concluded that, under the circumstances—which included Justyna's young age and the horrifying events of the day—her failure to react, either to the photographic array or to Masternak's questioning, was too ambiguous a response to warrant its admission into evidence. See *State* v. *Vitale*, 197 Conn. 396, 405, 497 A.2d 956 (1985) (where silence is offered as nonassertive conduct, such evidence is inadmissible unless it is "a reliable indicator of what the [proffering party] claims it tended to communicate"); C. Tait & J. LaPlante, supra, § 11.2, pp. 320–21 (nonassertive conduct admissible as nonhearsay only if court is satisfied that conduct in question is sufficiently probative and trustworthy).

---

[34] The defendant, who did not testify, presented this claim through the testimony of Standish, who indicated that she arrived at the defendant's home at 11:30 p.m. on December 20, 1992, that she fell asleep at approximately 1:30 a.m. on December 21, while the defendant was in the room with her and that the defendant was in bed with her, asleep, when she awoke at approximately 6:20 a.m. Standish, however, also testified that she could not account for the defendant's whereabouts from the time she fell asleep until she awoke, that her car was missing when she awoke and that the defendant had told her that he had committed a burglary that night, during the course of which an occupant of the home had been stabbed. Standish also testified that the defendant later informed her that Justyna had witnessed the crime and that Justyna would never forget it.

[35] The defendant told Standish that Justyna had witnessed the stabbing. The defendant, however, does not rely on this statement in support of his claim.

Even if we were to assume, arguendo, that the defendant had a sixth amendment right to present Masternak's testimony, its exclusion was harmless beyond a reasonable doubt. The evidence against the defendant was overwhelming. He admitted to his girlfriend, Standish, that he had participated in a burglary that night, DNA evidence linked him to the crime scene and to the bloody gloves, Standish's car was discovered near the Urbanski home, the defendant was the same height and build as the masked intruder described by the Urbanskis' neighbors and the defendant had been to the Urbanski home and knew the victim. Furthermore, as discussed previously, there has been no showing that Justyna ever saw the intruder's face. In light of this fact, and in view of Justyna's age and the tragic circumstances under which she was questioned about the photographic array, it is not reasonably possible that evidence of Justyna's failure to react to the photographic array would have had any bearing on the jury's deliberations. Accordingly, we reject the defendant's claim that he is entitled to a new trial because the trial court precluded him from eliciting Masternak's testimony concerning Justyna's response to the photographic array.

B

The defendant next contends that the trial court improperly prohibited him from introducing into evidence a pair of sneakers that had been seized from the defendant after his arrest on the day of the murder. We disagree.

The following additional facts are relevant to our resolution of this claim. When investigating officers entered the basement of the Urbanski home, they discovered a piece of plexiglass lying near the missing basement window through which the perpetrator apparently had gained entry to the premises. Inspection of

the plexiglass revealed a partial shoe print. Kenneth Zercie, a footwear imprint examiner, testified that the print on the plexiglass was from the toe area of a boot with a trapezoid sole pattern. Sheldrick, the first police officer to enter the basement after the crime, testified that he had not stepped on or otherwise touched the plexiglass. Zercie, however, could not exclude as the source of the shoe print the size twelve boots that Sheldrick had been wearing when he entered the Urbanski home.

The defendant was taken into custody at approximately 6:45 a.m. on December 21, 1992. Sergeant Thomas Marino of the New Britain police department testified that a search warrant had been obtained for the defendant's person and, at approximately 2:45 p.m. that day, the police seized the pair of size eight sneakers the defendant had been wearing at that time.

The defendant sought to introduce into evidence those size eight sneakers, claiming that they were relevant as proof that the imprint on the plexiglass could not have been made by footwear as small as a size eight. The state objected to the admission of the sneakers on relevancy grounds, and the trial court sustained the state's objection.

We agree with the state that the trial court did not abuse its discretion in concluding that the defendant had failed to establish the relevancy of the sneakers. The state never claimed that the shoe print on the piece of plexiglass had come from a sneaker. Zercie, the defendant's expert, testified that the impression likely had been left by a boot. Moreover, in light of Marino's testimony that the police had seized the pair of size eight sneakers that the defendant had been wearing following his arrest, we do not see how the defendant possibly could have been harmed by the trial court's

exclusion of the footwear. Accordingly, the defendant's claim is without merit.

## III

The defendant next contends that the trial court abused its discretion in restricting his cross-examination of Prevo. The defendant maintains that the trial court's ruling violated the rules of evidence and his rights under the confrontation clause of the sixth amendment to the United States constitution.[36] We are not persuaded.

The following additional facts are relevant to the defendant's claim. On direct examination, Prevo testified that he and the defendant had visited the victim at her home on one occasion and, thereafter, had spoken to the victim on the telephone several times. Prevo also testified that, during one such telephone call, he had heard the defendant ask the victim if she had a boyfriend.[37] On cross-examination, defense counsel

[36] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Again, the defendant makes no independent state constitutional claim.

[37] The relevant portion of Prevo's testimony was as follows:

"[Herbert Carlson, Senior Assistant State's Attorney]: And at any time when you called [the victim] from [the defendant's] house and you were speaking with [the victim], at any point in time during the entire phone call . . . did [the defendant] speak with [the victim] also?

"[Prevo]: Yes.

"[Mr. Carlson]: And did you hear any of the conversation that he had with [the victim]?

"[Prevo]: It was just like, you know, how you doing? You have a boyfriend? You know, you know, small talk.

\* \* \*

"[Mr. Carlson]: So you heard [the defendant] ask [the victim] whether or not she had a boyfriend?

"[Prevo]: Yes.

"[Mr. Carlson]: All right. And, of course, you weren't able to hear what she had to say?

"[Prevo]: No.

"[Mr. Carlson]: You didn't have a speaker phone, for example?

"[Prevo]: No.

asked Prevo if he had had an "intimate relationship" with the victim. The state objected to the question on relevancy grounds. The defendant claimed that the information was relevant to demonstrate that Prevo was lying when he stated that the defendant had asked the victim if she had a boyfriend. The trial court then allowed defense counsel to conduct a voir dire examination of Prevo out of the jury's presence.

On voir dire, Prevo testified that he had known the victim for about one month before leaving the state for military duty on December 10, 1992. He also stated that he had spoken frequently to the victim on the telephone, that he had been to her house on two occasions prior to the time that the defendant accompanied him there and that he and the victim "were just friends." Prevo further testified that he had told the defendant that he had had sex with the victim, but denied telling the defendant anything to indicate that she was his girlfriend or that the victim considered him to be more than a casual acquaintance.

Defense counsel argued that he was entitled to apprise the jury that Prevo had acknowledged having sex with the victim. According to defense counsel, Prevo's statement to the defendant regarding his alleged sexual liaison with the victim cast doubt on Prevo's earlier statement that he had overheard the defendant ask the victim if she had a boyfriend. Specifically, defense counsel claimed that it is unlikely that the defendant would have asked the victim such a question if Prevo had told him that he, Prevo, had had sex with the victim. The trial court sustained the state's objection to defense counsel's inquiry as to whether Prevo and the victim had been intimate.[38]

---

"[Mr. Carlson]: Is there anything else that you recollect that he said?

"[Prevo]: It was nothing important or major."

[38] The defendant, who did not raise a constitutional claim at trial, seeks to prevail on his unpreserved sixth amendment claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

"The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . However, [t]he [c]onfrontation [c]lause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . Thus, [t]he confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination. . . . The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable. . . . [Furthermore, the] trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . [Finally, the] proffering party bears the burden of establishing the relevance of the offered testimony." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Andrews*, 248 Conn. 1, 11, 726 A.2d 104 (1999); see also *State* v. *Lee*, 229 Conn. 60, 70, 640 A.2d 553 (1994) (trial court has wide latitude to place reasonable limits on such cross-examination "based on concerns about . . . harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant" [internal quotation marks omitted]).

We conclude that the trial court did not abuse its discretion in prohibiting the defendant from questioning Prevo as to whether he ever had been intimate with the victim. The trial court reasonably determined that there was nothing inherently contradictory about Prevo's testimony that he had overheard the defendant ask the victim whether she had a boyfriend, on the one hand, and Prevo's testimony during defense counsel's voir dire examination that he had told the defendant that he had had sex with the victim, on the other hand. Moreover, the record does not reveal whether Prevo told the defendant of his alleged sexual encounter with the victim before or after the defendant had asked the victim whether she had a boyfriend. It simply does not follow, therefore, that, as the defendant claims, he likely would not have inquired of the victim, in a casual telephone conversation, whether she had a boyfriend, because, at some point, Prevo informed the defendant that he had had sex with the victim.

Even if the defendant's inquiry bore some slight relevance to Prevo's credibility, the issue of whether the defendant had asked the victim about a boyfriend was hardly a central issue in the case, a fact that the trial court was entitled to consider in determining whether to allow the defendant to pursue that line of inquiry. Furthermore, the trial court did not otherwise limit the defendant's opportunity to cross-examine Prevo, whose testimony regarding the defendant's prior contacts with the victim never was seriously contested by the defendant. Indeed, despite the latitude afforded the defendant to show that Prevo's testimony may have been the product of bias, prejudice or self-interest, the defendant has failed to identify any reason why Prevo would have been motivated to lie about the substance of the defendant's telephone conversations with the victim or, for that matter, about anything else. Thus, even if it is assumed, arguendo, that the defendant should have been allowed

to elicit testimony from Prevo that the defendant was aware of his claim that he had had sex with the victim, that fact was of such slight relevance as to any issue in the case that the defendant's inability to use it for impeachment purposes could not possibly have been harmful.[39] Accordingly, we reject the defendant's argument that he is entitled to a new trial because the court restricted his cross-examination of Prevo.[40]

## IV

The defendant also contends that the trial court improperly instructed the jury on kidnap-murder under § 53a-54b (5). See footnote 1 of this opinion. Specifically, the defendant, relying primarily on comments made by several legislators during the course of the floor debate over Public Acts 1973, No. 73-137, § 3 (P.A. 73-137), which was subsequently codified at General Statutes (Rev. to 1975) § 53a-54b, maintains that the state was required to prove that the defendant had demanded the payment of ransom in connection with the victim's kidnapping.[41] Because the trial court rejected the defendant's request for a jury instruction

[39] Although the defendant asserts that the trial court's limitation of his cross-examination of Prevo rises to the level of a constitutional violation, it is clear that the defendant's claim presents an evidentiary, rather than a constitutional, question, because the court's ruling involved a line of inquiry that was only remotely related, if at all, to Prevo's credibility. As we repeatedly have stated, "a nonconstitutional claim cannot be transformed into a constitutional claim simply by virtue of the label placed upon it by a party." *State* v. *Schiappa*, 248 Conn. 132, 164, 728 A.2d 466 (1999); accord *State* v. *Walton*, 227 Conn. 32, 65, 630 A.2d 990 (1993).

[40] The defendant also asserts, for the first time on appeal, that the trial court's limitation of his cross-examination of Prevo violated his federal constitutional right to present a defense. The defendant, however, has not articulated any basis for such a claim, which he states only in conclusory fashion. Accordingly, we consider only his claim under the confrontation clause.

[41] Defense counsel requested such an instruction and, when the trial court failed to give it, noted his exception. It is undisputed that no ransom was demanded in this case.

regarding the requirement of a demand for ransom, the defendant claims a violation of his due process right to a properly instructed jury. This claim is without merit.

Our analysis of the defendant's claim "is governed by well established principles of statutory construction. Statutory construction is a question of law and therefore our review is plenary. . . . [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Several additional tenets of statutory construction guide our interpretation of a penal statute. First, we must take care not to impose criminal liability where the legislature has not expressly so intended. . . . Second, [c]riminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . Finally, unless a contrary interpretation would frustrate an evident legislative intent, criminal statutes are governed by the fundamental principle that such statutes are strictly construed against the state." (Citations omitted; internal quotation marks omitted.) *State* v. *Dash*, 242 Conn. 143, 146–47, 698 A.2d 297 (1997). Moreover, as we previously have noted, "[t]hese considerations are especially pertinent to a death penalty statute such as § 53a-54b." *State* v. *McGann*, 199 Conn. 163, 177, 506 A.2d 109 (1986); see also *State* v. *Breton*, 212 Conn. 258, 269, 562 A.2d 1060 (1989) (principle requiring construction of penal statute in favor of accused is "all the more compelling where . . . life [or death] is at stake").

Our point of departure is the statutory language itself, which, of course, must be construed in light of the

relevant statutory scheme. When P.A. 73-137 was enacted, there were, as there are now, two degrees of kidnapping: first degree kidnapping under General Statutes (Rev. to 1972) § 53a-92,[42] and second degree kidnapping under General Statutes (Rev. to 1972) § 53a-94.[43] Section 3 of P.A. 73-137 made no distinction between those two degrees of kidnapping, but, rather, referred to the crime of kidnapping generally. We presume, as we must, that the legislature was aware of the penal code provisions pertaining to kidnapping extant when the bill that later became P.A. 73-137 was passed. See, e.g., *Dodd* v. *Middlesex Mutual Assurance Co.*, 242 Conn. 375, 386, 698 A.2d 859 (1997) ("[t]he legislature is presumed to be aware and to have knowledge of all existing statutes and the effect which its own action or nonaction may have on them"). It is therefore logical to conclude that the reference to kidnapping in P.A. 73-137 was intended to encompass the conduct prohibited by both General Statutes (Rev. to 1991) § 53a-92 and General Statutes (Rev. to 1991) § 53a-94.[44] That conduct

[42] General Statutes (Rev. to 1972) § 53a-92 provides in relevant part: "Kidnapping in the first degree . . . . (a) A person is guilty of kidnapping in the first degree when he abducts another person and when: (1) His intent is to compel a third person to pay or deliver money or property as ransom, or to engage in other particular conduct or to refrain from engaging in particular conduct; or (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function . . . ."

This version is identical in all material respects to the version of § 53a-92 in effect when the defendant committed the crime that led to his conviction under § 53a-54b (5). See General Statutes (Rev. to 1991) § 53a-92, as amended by Public Acts 1992, No. 92-260, § 36.

[43] General Statutes (Rev. to 1972) § 53a-94 provides in relevant part: "Kidnapping in the second degree . . . (a) A person is guilty of kidnapping in the second degree when he abducts another person. . . ."

This version is identical to the version of § 53a-94 in effect when the defendant committed the crime that led to his conviction under § 53a-54b (5). See General Statutes (Rev. to 1991) § 53a-94.

[44] The defendant asserts that we should look to the dictionary definition of the term "kidnap" to discern the meaning of the word for purposes of

includes, *but is not limited to*, the abduction of another person with the intent to compel a third person to pay or deliver money or property as ransom.[45] See generally General Statutes (Rev. to 1991) § 53a-92, as amended by Public Acts 1992, No. 92-260, § 36.

Furthermore, under the interpretation of § 53a-54b (5) urged by the defendant, a person who abducts

§ 53a-54b (5). It is true that, absent any statutorily prescribed definition, we generally look to the commonly approved meaning of a term; see General Statutes § 1-1 (a); which usually may be ascertained by resorting to the dictionary definition. See *State* v. *Love*, 246 Conn. 402, 408, 717 A.2d 670 (1998). As we have explained, however, the legislature presumably was aware of the existence of the penal code provisions regarding kidnapping when it passed the bill that later became P.A. 73-137, and it is reasonable to conclude, therefore, that the legislature had those provisions in mind when it included the crime of kidnapping in P.A. 73-137, § 3.

Even if we agreed with the defendant's approach to ascertaining the meaning of the pertinent statutory language, however, the defendant cannot prevail on his claim. Under § 53a-54b (5), a kidnapper is guilty of capital murder when he or she murders the kidnapped person during the course of a kidnapping. Webster's Third New International Dictionary defines "kidnapping" as "the act or an instance of stealing, abducting, or carrying away a person by force or fraud often with a demand for ransom," defines "kidnapper" as "one that abducts a child for ransom," and defines "kidnap" as "to carry (an unwilling person) away by unlawful force or fraud or to seize and detain for the purpose of so carrying away . . . ." Under these definitions, a kidnapping may involve, and sometimes does involve, a demand for ransom. It is equally clear, however, that, in common parlance, such a demand is not considered a necessary component of the act of kidnapping. Thus, the unambiguous wording of § 53a-54b (5) includes no requirement of a demand for ransom.

[45] We note that, for purposes of §§ 53a-92 and 53a-94, " '[a]bduct' means to restrain a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation"; General Statutes § 53a-91 (2); and " '[r]estrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. . . ." General Statutes § 53a-91 (1). In this case, the evidence supported the state's contention that the victim had been "abducted" for purposes of our kidnapping statutes, and the defendant makes no claim to the contrary.

another in a sufficiently aggravated manner as to constitute kidnapping in the first degree, but who does not demand ransom, could not be convicted of kidnap-murder under § 53a-54b (5). Indeed, under the statutory construction espoused by the defendant, a person who commits the crime of kidnapping in the first degree with a firearm,[46] an aggravated form of first degree kidnapping, might not fall within the ambit of § 53a-54b (5). The defendant has provided no persuasive reason, and we are aware of none, why the legislature would adopt a capital felony scheme that distinguishes between these different methods of committing the crime of first degree kidnapping.

Moreover, if the legislature had sought to distinguish between the different degrees of kidnapping for purposes of § 53a-54b (5), it knew how to do so. Indeed, the legislature made such a distinction in enacting § 53a-54b (7), which makes it a capital felony to commit a murder in the course of the commission of a sexual assault in the first degree only. The fact that the legislature did not restrict § 53a-54b (5) to those kidnappings that are accompanied by a demand for ransom is a compelling indication that the legislature did not intend to so limit the scope of § 53a-54b (5).

Similarly, when the legislature intended that the crime of capital felony include conduct undertaken to acquire something of value, the legislature expressly did so. See General Statutes § 53a-54b (2) (designating as capital felony "murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain"). By contrast, the absence of any language in § 53a-54b (5) indicating that the kidnapping must be motivated by pecuniary gain strongly suggests that the legislature did not intend

---

[46] See General Statutes § 53a-92a.

to restrict that capital felony provision to kidnappings accompanied by a demand for ransom.

The defendant nevertheless contends that the legislative history of P.A. 73-137 indicates an intent by the legislature to exclude from the purview of the capital felony statute all kidnappings except those in which the kidnapper demands ransom. The defendant refers to the statements of several legislators who, during the debate on P.A. 73-137, adverted to kidnappings for ransom in connection with their comments supporting the legislation.

The defendant first cites to certain remarks made by Senator George C. Guidera, the Senate chairman of the judiciary committee and a sponsor of the capital felony legislation. In the course of his comments explaining the proposed statute, Senator Guidera offered several examples of the kinds of offenses for which a defendant could be convicted of capital felony, including "the lifer who [murders a correctional officer while] attempt[ing] to escape from prison, the roof top sniper who fires on [and kills] firemen in the performance of their duties, the bank robber or the liquor store holdup man who kills a policeman who attempts to foil his plans—the [murderer of a] deputy sheriff who is transporting a prisoner, the murderer who has already been convicted of one murder, [and] the kidnapper, who when paid his ransom or when denied it, arbitrarily and senselessly chooses to kill the kidnapped, usually a child." 16 S. Proc., Pt. 4, 1973 Sess., p. 1868. Viewed in its proper context, it is apparent that Senator Guidera's reference to a kidnap-murder involving a demand for ransom, like the other scenarios he identified concerning the intentional killings of law enforcement personnel, was intended only as an example of a kidnap-murder for which a defendant could receive the death penalty, not as the exclusive means by which a kidnapper could be subject to the death penalty.

The defendant also relies on a comment by Representative James F. Bingham, who, during a debate on a proposed amendment to delete kidnap-murder from the legislation, spoke briefly in opposition to the amendment. Representative Bingham noted that "[m]urder by a kidnapper of a kidnapped person is the same as murder for hire. It is a heinous crime and should be treated the same as the other specific crimes enunciated in the bill." 16 H.R. Proc., Pt. 6, 1973 Sess., p. 2964. The defendant asserts that Representative Bingham, by equating murder for hire with kidnap-murder, was expressing his understanding that the latter, like the former, requires proof of a pecuniary motive for the commission of the offense. Although the interpretation urged by the defendant is not an unreasonable one, we are not persuaded that Representative Bingham's exceedingly brief, two sentence statement—upon which he did not elaborate—necessarily reflected a belief that a demand for ransom was intended to be an element of kidnap-murder. Indeed, because Representative Bingham never articulated the reason why he equated murder for hire with kidnap-murder, we do not know whether he did so because he believed that both offenses required proof of a pecuniary motive or, rather, because he felt that both crimes were sufficiently deplorable to warrant the death penalty.

Finally, the defendant claims that his interpretation of the kidnap-murder provision of § 53a-54b is supported by a statement made by Representative Samuel S. Freedman who, while speaking in favor of the legislation, noted, among other things, that "this bill attacks the paid killer, those who would seek to gain from the crime of murder." Id., p. 2977. Representative Freedman's remark, however, was part of a longer statement in which he set forth a number of reasons why he supported the death penalty bill, including those provisions of the bill that did not require proof of a pecuniary

motive, such as the provision dealing with the murder of a police officer. Again, it is apparent that, taken in context, Representative Freedman's comment was intended only as an example of the "heinous offenses" for which the penalty of death was, in his view, appropriate. See id.

In sum, our careful reading of the legislative history relied upon by the defendant does not persuade us that the legislature intended the narrow reading of the kidnap-murder provision of § 53a-54b espoused by the defendant. We are guided, instead, by the plain and unambiguous language of that provision.[47] Thus, we reject the defendant's claim that § 53a-54b (5) applies only when the victim of a kidnap-murder is the subject of a demand for ransom.

## V

Finally, the defendant claims that because he will be required to spend the remainder of his life in prison under the sentence imposed on the capital felony count, the consecutive terms of imprisonment imposed on the burglary and risk of injury counts are superfluous. The defendant asserts that, in light of that fact, the legislature could not reasonably have intended for any term of imprisonment to run consecutively to a sentence of life without the possibility of release. This claim also is without merit.

---

[47] The defendant asserts that the rule of lenity applies to our analysis of his claim. We disagree. "[T]he 'touchstone' of this rule of lenity is 'statutory ambiguity.' . . . [W]e . . . [reserve] lenity for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Hinton,* supra, 227 Conn. 317–18. Because we perceive no ambiguity in the relevant statutory provision, the rule of lenity is inapplicable.

Under General Statutes § 53a-37,[48] the trial court is authorized to impose sentences on multiple counts either to run concurrently with each other or to run consecutively to each other. The determination whether to impose concurrent or consecutive sentences is a matter within the sound discretion of the trial court. The defendant has provided us with no authority, and we are aware of none, that limits the ability of the trial court to impose a term of incarceration consecutive to a sentence of life imprisonment without the possibility of release.

Contrary to the defendant's contention, therefore, the fact that the defendant necessarily will serve the rest of his life in prison solely as a result of his capital felony conviction does not deprive the trial court of the authority to impose consecutive prison terms on the burglary and risk of injury counts. In the absence of any express prohibition by the legislature, the court had the right to impose such additional, consecutive time, even if only as an expression of outrage over the especially heinous nature of the defendant's conduct.[49]

[48] General Statutes § 53a-37 provides: "Multiple sentences: Concurrent or consecutive, minimum term. When multiple sentences of imprisonment are imposed on a person at the same time, or when a person who is subject to any undischarged term of imprisonment imposed at a previous time by a court of this state is sentenced to an additional term of imprisonment, the sentence or sentences imposed by the court shall run either concurrently or consecutively with respect to each other and to the undischarged term or terms in such manner as the court directs at the time of sentence. The court shall state whether the respective maxima and minima shall run concurrently or consecutively with respect to each other, and shall state in conclusion the effective sentence imposed. When a person is sentenced for two or more counts each constituting a separate offense, the court may order that the term of imprisonment for the second and subsequent counts be for a fixed number of years each. The court in such cases shall not set any minimum term of imprisonment except under the first count, and the fixed number of years imposed for the second and subsequent counts shall be added to the maximum term imposed by the court on the first count."

[49] Indeed, at the sentencing proceeding, the trial court indicated that the sentence was intended to send just such a message, stating as follows: "The crime—I think unspeakable is a good word to describe this crime—calls out for deterrence in the extreme. And the horrible nature of the crime

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and BORDEN, NOR-COTT, KATZ and MCDONALD, Js., concurred.

BERDON, J., dissenting. The analysis contained in the majority opinion is neither complete nor adequate. In my view, my colleagues have not justified their decision to uphold the state's exercise of peremptory challenges to excuse one Latino juror and two African-American jurors.

What I had to say in my dissenting opinion in *State* v. *Hodge*, 248 Conn. 207, 269, 726 A.2d 531 (1999), applies with full force to the present case. "A judicial branch task force recently . . . found that there is 'a perception of bias in jury selection.' Connecticut Judicial Branch Task Force on Minority Fairness, Full Report (April 1996) p. 42. More fully, 'there is a concern that minorities are being removed from the chosen jury pool through the use of peremptory challenges allowed by attorneys during the selection process.' Id. The report indicates that an overwhelming percentage of judges and attorneys recognize that minorities do not feel that they are being treated fairly. Id., p. 41. More generally, another survey conducted for the state judicial branch in 1998 revealed that 45.5 percent of the Connecticut residents polled agreed that 'Connecticut courts discriminate against minorities.' Connecticut Judicial Branch, Statewide Public Trust and Confidence Study (October 1998) p. 17." *State* v. *Hodge*, supra, 270–71 (*Berdon, J.*, dissenting). These results were recently confirmed in a poll conducted by the Center

makes retribution extremely appropriate. Therefore, it is my intention to impose the maximum sentence possible under the law. I would do that on any combination of counts on which I were sentencing. The maximum penalty is something that should be reserved for those rare cases which cry out for it and this is, without cavil, one of those cases. Fortunately, they don't come along very often but this is surely one."

for Survey Research and Analysis at the University of Connecticut.[1]

"This perception of racism is not the fault of the trial judges. Rather, to a great degree, this court must assume responsibility because it narrowly shapes the protective contours of our laws regarding jury selection and has failed repeatedly to apply those limited protections in order to assure that the selection is not tainted. Instead of firmly setting out the law for the guidance of the trial courts, this court sends mixed messages, as the majority does in the present case. Even worse, when confronted with obvious cases of the state's intentional discriminatory use of peremptory challenges in order to eliminate minorities, this court avoids reversal, as it does in this case, by affording the trial court great deference and refusing to overrule any trial court decision unless it is clearly erroneous. In short, the majority of this court does nothing more than pay lip service to the constitutional command that a peremptory challenge cannot be employed to exclude prospective jurors on the basis of race, gender or other prohibited discrimination pursuant to *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and as modified by state law in *State* v. *Holloway*, 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989) (hereinafter *Batson/Holloway*). Indeed, since the adoption of *Batson* by the United States Supreme Court in 1986, this court and the Appellate Court have reviewed claims of purposeful discrimination in the exercise of peremptory challenges in seventeen cases. Neither court, however, has ever found impermissible discrimination in the exercise of

---

[1] See D. Tofig, "Public Doubts Notion of Justice For All," Hartford Courant, June 21, 1999, p. A1. The poll was conducted May 18 through May 25, 1999. Id., p. A7.

a peremptory challenge,[2] a statistical fact that lends credence to the public perception that our judicial system fosters discrimination." (Internal quotation marks omitted.) *State* v. *Hodge,* supra, 248 Conn. 271–73 (*Berdon, J.,* dissenting).

It is against this backdrop that my disagreement with the majority must be considered. To begin with, the majority "summarize[s] the applicable law" by reciting a seven page passage from *Hodge.* As I explained at length in my dissent in *Hodge,* the toothless standard of review employed by the majority suffers from two grave infirmities: (1) it contradicts our prior jurisprudence; and (2) it is not sufficiently rigorous to detect the presence of racism. It would serve no useful purpose to cover this ground again. It suffices to say that the majority once again "ignores the heightened standard with which we review findings of factual underpinnings necessary to determine constitutional issues arising from jury selection. In *State* v. *Ellis,* 232 Conn. 691, 701, 657 A.2d 1099 (1995), Justice Norcott writing for a unanimous court held: [B]ecause of the constitutional implications of the alleged defect in the jury selection process, we will subject the findings of the trial court to the same independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding . . . . *State* v. *Ross,* 230 Conn. 183, 259, 646 A.2d 1318 (1994) . . . . *Ellis* is by no means an isolated case. We have recognized this heightened review in other cases. See *State* v. *Webb,* 238 Conn. 389, 449, 680 A.2d 147 (1996); *State* v. *Medina,* 228 Conn. 281, 294, 636 A.2d 351 (1994); *State* v. *Greenfield,* 228 Conn. 62, 68–69, 634 A.2d 879 (1993). To be sure, if there is any question about our review, it clearly was put to rest in *State* v. *Mercer,* 208 Conn. 52, 58,

[2] With the release of *Hodge, State* v. *Cepeda,* 51 Conn. App. 409, 426–27, 723 A.2d 331 (1999), and today's decision in the present case, this grim tally has now risen to twenty.

544 A.2d 611 (1988): Due to the serious constitutional implications of the defendant's claim [regarding voir dire during jury selection], we have the duty to make an independent evaluation of the circumstances. *Sheppard* v. *Maxwell*, 384 U.S. 333, 362–63, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966); *State* v. *Marra*, 195 Conn. 421, 428, 489 A.2d 350 (1985); *State* v. *Piskorski*, 177 Conn. 677, 685–86, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). I can conclude only that the majority either fails to take seriously *Batson/Holloway* claims or fails to understand that those claims have constitutional underpinnings. It simply is baffling that the majority is turning a blind eye to our former jurisprudence in this area." (Internal quotation marks omitted.) *State* v. *Hodge*, supra, 248 Conn. 287–88 (*Berdon, J.*, dissenting). After conducting an "independent and scrupulous examination of the entire record"; (internal quotation marks omitted) id., 287; I am firmly convinced that the trial court should have recognized that the state's peremptory challenges of one Latino juror and two African-American jurors violated *Batson/Holloway*.

In addition, my colleagues acknowledge—as they must—that a peremptory strike violates the constitution if "persons with the same or similar characteristics but not the same race . . . as the challenged juror were not struck . . . ." (Internal quotation marks omitted.) See *State* v. *Hodge*, supra, 248 Conn. 222; *State* v. *Hinton*, 227 Conn. 301, 325, 630 A.2d 593 (1993). Nevertheless, the majority refuses to consider this issue, on the ground that the defendant "failed to make this claim in the trial court." I have three responses to this claim. First, we have long reviewed disparate treatment claims for the first time on appeal. See *State* v. *Gonzalez*, 206 Conn. 391, 406–407, 538 A.2d 210 (1988). Second, we have before us a complete transcript of the voir dire in this case. Because we are therefore able to review

a sensitive racial issue of constitutional magnitude, we should do so. Third, even the state concedes that we should review this claim in this case, at least with respect to one of the peremptory strikes that the defendant has challenged.

Needless to say, the majority opinion does not come as much of a surprise. It simply adds yet another decision to the long and unbroken string of cases in which this court and the Appellate Court have declined to find impermissible discrimination in jury selection, even when they have been confronted with the most flagrant evidence of outrageous discrimination. *State* v. *Hodge*, supra, 248 Conn. 272 n.4 (*Berdon, J.*, dissenting).

Accordingly, I dissent.