******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* EVAN JARON HOLMES
## (AC 39077)

Lavine, Prescott and Beach, Js.

*Syllabus*

Convicted of the crimes of felony murder, home invasion, conspiracy to commit home invasion and criminal possession of a pistol or revolver, the defendant appealed. The defendant's conviction stemmed from an incident in which he and S allegedly forced their way into the apartment of the victim and fired ten gunshots from an automatic pistol at the victim, who died from his injuries. The defendant claimed, inter alia, that the trial court improperly overruled his objection, pursuant to *Batson* v. *Kentucky* (476 U.S. 79), to the state's use of a peremptory challenge to strike W, an African-American prospective juror. The state exercised its peremptory challenge to exclude W after he made comments suggesting that he may harbor resentment toward police and prosecutors, and that he had concerns regarding the fairness of the criminal justice system. *Held*:

1. The trial court properly denied the defendant's *Batson* challenge and determined that the state's use of its peremptory challenge to exclude W from the jury was not tainted by purposeful racial discrimination, the state having advanced a plausible and, on its face, race neutral explanation for its having exercised a peremptory challenge, and the defendant having failed to show that the trial court's factual conclusion that the prosecutor did not act with discriminatory intent in exercising the peremptory challenge was clearly erroneous; the state's reasons for excluding W were his stated distrust of police and the criminal justice system, which clearly related to the trial of this criminal proceeding, in which the police would provide significant evidence, the state exercised its peremptory challenge only after engaging in a detailed discussion with W about the views he had expressed in response to defense counsel's questions, the state asked a relatively uniform set of questions of all jurors, there was no evidence of any venireperson of a race different from that of W who expressed the same or similar views regarding the police and the criminal justice system but who was nevertheless permitted to serve on the jury, the state did not advance any explanation that was based on an inapplicable group trait, and it did not use a disproportionate number of peremptory challenges to exclude African-Americans from the jury, which, was comprised in part of three African-Americans; moreover, our Supreme Court previously has held that a venireperson's expressed fear of police is a race neutral ground for exercising a peremptory challenge, and this court cannot modify a decision of our Supreme Court and must follow it as binding precedent, and, furthermore, the state was not required to accept W's assurances that he believed he could follow the court's instructions and act as an impartial juror.

2. The defendant could not prevail on his claim that the trial court improperly admitted a tape-recorded statement of a witness as a prior inconsistent statement pursuant to *State* v. *Whelan* (200 Conn. 743) because it lacked the necessary indicia of reliability; the defendant having failed to adequately brief how he was prejudiced by the court's allegedly erroneous evidentiary ruling or how it may have affected the outcome of the trial, he failed to meet his burden of showing both that the court's evidentiary ruling was improper and harmful, and, therefore, the claim was deemed abandoned and this court declined to address its merits.

3. The defendant could not prevail on his claim, raised pursuant to *Doyle* v. *Ohio* (426 U.S. 610), that the state improperly infringed on his constitutional right to remain silent when it cross-examined him at trial about his failure to disclose to the police at the time of his arrest certain exculpatory information that he later testified to at trial: although defense counsel raised a *Doyle* objection at trial, it was subsequently abandoned, and the defendant could not prevail on his resurrected *Doyle* claim on appeal pursuant to *State* v. *Golding* (213 Conn. 233) because he failed to demonstrate that a constitutional violation existed that

deprived him of a fair trial, as the record showed that the defendant voluntarily spoke to a detective after he was in custody and had been advised of his *Miranda* rights, that he did not invoke his right to remain silent until after he was transported to the police department, that he chose to tell the detective that neither he nor his girlfriend had anything to do with the shooting incident and that there was no gun in his vehicle, and that he nevertheless testified on cross-examination that he never told the detective certain facts to which he testified on direct examination, and, therefore, rather than impermissibly attempting to impeach the defendant with his choice to remain silent, the state's cross-examination focused on why, having chosen to speak with the detective, the defendant never provided the same exculpatory details that he later testified to at trial; accordingly, the state properly inquired about the defendant's prior inconsistent statement to the detective, and that inquiry did not violate the rule set forth in *Doyle* that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process.

(*One judge concurring separately*)

Argued March 13—officially released September 5, 2017

*Procedural History*

Substitute information charging the defendant with the crimes of murder, felony murder, home invasion, conspiracy to commit home invasion, burglary in the first degree and criminal possession of a pistol or revolver, brought to the Superior Court in the judicial district of New London, where the first five counts were tried to the jury before *Jongbloed, J.*; verdict of guilty of the lesser included offense of manslaughter in the first degree with a firearm, felony murder, home invasion, conspiracy to commit home invasion and burglary in the first degree; thereafter, the charge of criminal possession of a pistol or revolver was tried to the court; judgment of guilty; subsequently, the court vacated the verdict as to the lesser included offense of manslaughter in the first degree with a firearm and burglary in the first degree, and rendered judgment of guilty of felony murder, home invasion, conspiracy to commit home invasion and criminal possession of a pistol or revolver, from which the defendant appealed; thereafter, the court, *Jongbloed, J.*, issued an articulation of its decision. *Affirmed.*

*Jay Alan Black*, assigned counsel, for the appellant (defendant).

*Paul J. Narducci*, senior assistant state's attorney, with whom were *Sarah Bowman*, assistant state's attorney, and, on the brief, *Michael L. Regan*, state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Evan Jaron Holmes, appeals from the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c, home invasion in violation of General Statutes § 53a-100aa (a) (2), and conspiracy to commit home invasion in violation of General Statutes §§ 53a-48 (a) and 53a-100aa. The defendant also appeals from the judgment of conviction, rendered after a trial to the court, of criminal possession of a pistol or revolver in violation of General Statutes § 53a-217.[1]On appeal, the defendant claims that the trial court improperly (1) overruled his objection to the state's use of a peremptory challenge to strike an African-American prospective juror; (2) admitted a tape-recorded statement of a witness pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986); and (3) permitted the state to cross-examine the defendant regarding his conversation with a police detective at the time of his arrest in violation of his right to remain silent. We are not persuaded by the defendant's claims on appeal and, thus, affirm the judgment of conviction.

The jury reasonably could have found the following facts. During the early morning hours of November 12, 2011, the defendant, who recently had been released from prison, attended an after-hours party at a club in New London with friends, including Davion Smith. During the party, the defendant was involved in an altercation outside the club with other attendees of the party, including Todd Silva. During the fight, the defendant suffered a laceration on his finger, a black eye, and other scratches and abrasions on his face. Following the fight, the defendant was angry and in a highly agitated state.

Sometime around 4 a.m. that same day, the defendant and Smith forced entry into a third floor apartment at 252 Montauk Avenue in New London, where the victim, Jorge Rosa, lived. The victim also was known by his nickname "Loc" or "Loke." At that time, Silva lived in the apartment with the victim.

Inside the apartment, the victim and his girlfriend, Gabriela Gonzales, were sleeping in his bed. The defendant and Gonzales previously had been in a romantic relationship that began in high school, but that relationship had ended when Gonzales obtained a restraining order against the defendant, who shortly thereafter went to prison.

Gonzales awoke to find the defendant and Smith standing at the foot of her bed, each pointing a gun at the victim. The defendant asked who "Loke" is. The defendant then fired ten shots from an automatic pistol at the victim, who died within a few minutes from numerous gunshot wounds, including several to his

chest, arms, and genitalia. The defendant and Smith subsequently fled the apartment. The defendant's blood, from his lacerated finger, and DNA were subsequently found in the stairwell leading up to the victim's apartment and in various rooms inside the apartment, including the bedroom.

Gonzales called 911, and the police arrived a few minutes later. Although Gonzales initially stated to the police in the 911 call and at the scene that she did not know the identity of the shooter, within a short period of time and while still at the scene, she stated that the defendant had shot the victim and that Smith had accompanied him. She also described the defendant's automobile, a white "Crown Vic," to assist the police in locating him.

At approximately 4:45 a.m., the defendant picked up his girlfriend, Shanice Sebastian, and told her that they were going to stay in a motel. The defendant and Sebastian then checked into the Days Inn in Old Saybrook, despite the existence of numerous motels closer to their location in New London. While at the Days Inn, the defendant admitted to Sebastian that he had been looking for the kid that "jumped him," that he had gone to the apartment of Gonzales' boyfriend and shot somebody, and that he had been with "his boy."

At approximately 9:30 a.m., a patrolman employed by the Old Saybrook Police Department observed the defendant's vehicle at the Days Inn. Other police units responded and located the defendant, who then attempted to flee. He was apprehended in the parking lot with the assistance of a K-9 officer. The defendant was still bleeding from his finger at the time of his arrest. Additional facts will be set forth as necessary to discuss the specific claims of the defendant.

The defendant subsequently was tried before a jury and elected to testify at trial. He denied shooting the victim but admitted that he had been in the victim's apartment with Smith and another individual, Zach Perkins, just prior to the time of the shooting in order to resolve amicably his dispute with Silva.[2] The defendant testified that he left the apartment after being told that Silva was not there. Defense counsel argued to the jury that Gonzales had framed the defendant for the victim's murder, which actually had been committed by Perkins, who, after the shooting, had a sexual relationship with Gonzales and fathered a child with her.

As previously discussed, the jury found the defendant guilty of felony murder, home invasion, and other charges; see footnote 1 of this opinion; and the court found the defendant guilty of the gun possession charge. The jury found the defendant not guilty of murder. This appeal followed.

I

The defendant first claims that the court improperly

overruled his objection to the state's use of a peremptory challenge to strike an African-American prospective juror. We disagree.

The following facts are relevant to this claim. The defendant is of mixed race. On the first day of jury selection, defense counsel noted that the entire venire panel appeared to be "white Caucasian" and that every prospective juror who had completed a jury questionnaire had indicated that they were either white or Caucasian, or had not indicated a race or ethnicity.

On the second day of jury selection, only one prospective juror had indicated on the questionnaire that he or she was African-American. During the voir dire examination of one venireperson, W.T., he stated to defense counsel that he was African-American. W.T. indicated that he had obtained a master's degree in social work from the University of Connecticut and currently was employed by the state of Connecticut as a supervisory social worker with the Department of Children and Families.

He also disclosed that he performed volunteer work for the Department of Correction and had worked directly with inmates. When asked by defense counsel whether that work might affect him as a juror, W.T. responded: "Because I work with, like I say, inmates, and also my work, I do—I mean, you see a lot of different things and you see a lot of sad situations. I'm sure as a professional and because I work with people who've been through a lot of stuff, you know, I'm sure I have an understanding of what they're doing. And also, just—just in the criminal justice system in general, I know how sometimes people are not, you know, given a fair trial or they may be disproportionately have to go to jail and different things of that nature. So, part of my whole experience is as an African-American, as an American and also studying these situations, I know that there's a lot of issues go on in various systems. The criminal justice system, the educational system and various systems, but people are not fairly treated, so I know that much. But I don't use that, you know, I can—I could make a professional—and I think keep my composure and do my job just like—as a professional, as I work—even as I do volunteer work, but you have to know the reality in life as well, though." In response to a subsequent question by defense counsel regarding whether, in light of his life experiences, he could be fair to both sides in the case, W.T. stated that he could.

During the state's voir dire examination of W.T., the following exchange occurred:

"[The Prosecutor]: Now, you've obviously had a little more dealing with the court systems than most—most people that we see in through here. Have you formulated any opinions about the criminal justice system

based on your experiences? Is it too lenient, too stringent, it works, it doesn't work; any feeling about that.

"[W.T.]: And like I said, probably already share too much stuff about—that talk about in terms of I have seen people, have had family members had went to prison before.

"[The Prosecutor]: Right.

"[W.T.]: And I just think—I think that's why I became a social worker, because I wanted to make a difference, and that's why I have been doing mentoring programs—

"[The Prosecutor]: Yep.

"[W.T.]: —try to help young people so they won't get into trouble. So, I meant the system, all various systems, there's a lot of discrimination still goes out. Even today, ladies are still not getting equal pay. So, it's a lot. We've come a long way, but we have a long way to go.

"[The Prosecutor]: Right.

"[W.T.]: But I think I can make—I could keep the facts and be able to look at the facts of the case and judge by the facts.

"[The Prosecutor]: . . . We need to know how you're feeling, so we can make the appropriate assessment and you can make the appropriate assessment. . . . I think that it's not a perfect system, but it's improving every day, and [there are] not as many systems that I can think of that are, any—come anywhere close. One of the concerns that people may have is, jurors who are in the—using their time as a juror to try to fix the system. You indicated, and I think you said, that you would listen to the evidence and decide it on the evidence and you wouldn't let any concerns that you had filter in.

"[W.T.]: That's correct.

"[The Prosecutor]: Fair to say?

"[W.T.]: That's correct.

"[The Prosecutor]: Okay. And so, that you would sit and listen to what all the evidence is and make a decision based on the evidence.

"[W.T.]: That's correct. . . . . .

"[The Prosecutor]: Okay. With respect to that, as much as you know about those situations, were you satisfied with the way the police reacted to your family being or friend being the victim of a crime?

"[W.T.]: Sometimes and sometimes not.

"[The Prosecutor]: Okay.

"[W.T.]: So-so.

"[The Prosecutor]: Fair to say that it's an individual situation and that the police have been—have acted in

a way that was satisfactory toward your family members or friends, and in other situations they weren't satisfied with what the police did.

"[W.T.]: That's correct.

"[The Prosecutor]: Okay. Had you had any interactions with the police in any respect in which you developed an—either a strong, favorable impression or an unfavorable impression about the police and the way they treated you in any situation, speeding tickets, calling up to complain about any noisy neighbor, something with work.

"[W.T.]: I'm, like—just growing up in this society, I fear, you know, I fear my life. I got a new car, I feared that, you know, I might get stopped, you know, for being black, you know. So, you know, that's concerning and sometimes I get afraid—even me, you know, I—when I see the police in back of me, I wonder, you know, if I'm going to be stopped.

"[The Prosecutor]: Okay. Now with—with respect to that, there will probably be police officers who will be testifying here, and the judge will tell you that [you] can't give a police officer more credibility merely because they are a police officer. Conversely, though, they don't get less credibility merely became they are police officers. They are to be treated like anybody else. Would you have any difficulty following the judge's instructions concerning that?

"[W.T.]: No, I wouldn't.

"[The Prosecutor]: Okay. And I can appreciate what you're saying. Obviously, I haven't been in that—in your shoes. I haven't been in your situation, nor do we ask the jury to put themselves in the shoes of either the police or a particular defendant. We can't ask you to do that. But having now life's experience, is that something that you think you can put aside and decide the evidence based on everything that's presented to you, or is there some concern that you might have that you might not be able to do that."[W.T.]: No, I will be able to because another thing, too, is, I know good police officers who are—who are good people, nice people, mentors who work in the community. So—so, yes, I'd be able to.

"[The Prosecutor]: Okay. Okay. And have you had the positive experiences with the police as well?

"[W.T.]: Yes.

"[The Prosecutor]: Okay. So, I guess like anybody else, there are bad lawyers and there are good lawyers. There are bad social workers, there are good social workers. . . . But what I'm driving at is, we make an individual assessment based on what we hear and what we see and what we listen to. And that is what we're going to ask you to do if you're a juror.

"[W.T.]: Yes.

"[The Prosecutor]: We want to make sure you don't carry in any preconceived notions one way or the other.

"[W.T.]: Yes.

"[The Prosecutor]: No problems with that.

"[W.T.]: No problem.

"[The Prosecutor]: Okay. We can count on your word on that, then.

"[W.T.]: That's right.

"[The Prosecutor]: Okay. I asked about being the victim of a crime and your family member. The flip side to that, have you, any member of your family or any close personal friends ever been either accused or ever convicted of crimes?

"[W.T.]: Yes. I have family members who've been in— who served time in jail.

"[The Prosecutor]: Okay. This obviously is a crime of violence. Any—any family members who have been convicted of crimes of violence?

"[W.T.]: No. . . .

"[The Prosecutor]: You mentioned that your family members have—have served time. With respect to that, were—did you develop any feelings about the way the police had treated your family members in those situations?

"[W.T.]: Well, I think the—like I told you earlier, my life experiences living in this world—

"[The Prosecutor]: Right.

"[W.T.]: —you see that things are not fair. And then you—I mean, you—you experience things, you know, and you see things happen. And some things are not fair, some things not—not all people are the same, all police are not bad or, like, you know, just like you said everybody, but when you see firsthand your own family members, then you experience something a little bit different.

"[The Prosecutor]: Of course.

"[W.T.]: Other people who, you know, so—

"[The Prosecutor]: Of course. And I guess it's kind of tough, because I—you know, I could ask you questions all day long and I'm not going to get to know you as well you know yourself. But there's a difference, I think, between I'm upset that my family member had to go through this versus I'm upset that the police treated my family member in such a way. Do you understand the distinction I'm trying to make, that you're not satisfied that your family member ended up in prison versus I'm not satisfied that they were treated properly by either the court system or by the police. There's a difference, and I'm not sure I'm explaining it very well.

"[W.T.]: Are you saying more, like, for instance, like, someone may have gone to jail because they did something wrong—

"[The Prosecutor]: Right.

"[W.T.]: —and they had to pay the consequences.

"[The Prosecutor]: Right. And you know, like that, but—

"[W.T.]: So—exactly. You have to—even if it's your family member or not, you did something wrong, you need to pay the consequences.

"[The Prosecutor]: Right.

"[W.T.]: You need to pay the consequences for whatever you've done wrong, you know.

"[The Prosecutor]: Right."

Following the voir dire examination, defense counsel stated that W.T. was acceptable to the defendant. The state, however, exercised a peremptory challenge and asked that W.T. be excused.

The defendant immediately raised a *Batson*[3] objection to the state's use of a peremptory challenge, citing the fact that W.T. was the first African-American venireperson to be examined and that, in essence, W.T. had assured the court and the state that, regardless of his views about the criminal justice system or the police, he could be a fair and impartial juror.

The state then responded: "I understand exactly where [defense counsel] is coming from, would agree with him for the most part with the exception of, I do believe that there are race neutral reasons for this. It was somewhat of a struggle for me, but I looked at some of the answers. And even though he responded favorably after further questioning, the concerns that I did have was the—the comments that—about disproportionate amount of people being sent to jail, disproportionate amount of jail time, the fact that he's had family members who have been convicted and have served time, the fact that he works to rehabilitate people. And none of this is per se bad, but I think in the context of this particular case, it's important, it's race neutral. If we had a Caucasian who was in the same situation, the exercising of a peremptory challenge would be the same, I think.

"Additionally, the fact that he did mention . . . his concern about and his life's experience about driving and seeing a police officer behind him and his concern about police officers. Yes, he said that there are other police officers who are good and people can be good, but there is that life's experience that I would submit would make it difficult for him to be fair and impartial in this particular—in this particular case.

"Again, I understand exactly what [defense counsel]

is saying. I believe that they are race neutral reasons, and I was exercising the peremptory based on those race neutral reasons."

The court then asked for argument from the defendant, and defense counsel gave the following response: "With respect to being, as an African-American male, fearful when the police are behind you, I mean, that's just, you know, something that [the prosecutor] and I never have had to deal with it, but if this gentleman sitting next [to] me is entitled to a jury of his peers, we've picked three white people already. We've accepted them. I mean, isn't he—and that's a common complaint by African-American people, that they feel that they get pulled over too often, and there are probably studies that say it's disproportionate. So, that particular reason does seem to me to be race based . . . . It was [W.T.]'s view and, I mean, again, that's—he's entitled to a jury of his peers, and we get nobody who feels that way or has those thoughts is not really his peers because that's probably the experience or experiences of a lot of African-Americans go through."

The prosecutor, when asked if he wanted to argue further, stated: "Only briefly, and maybe it's a matter of semantics. I think *Batson*'s is, oh, I see an African-American gentleman, I see an Asian-American, I see a Hispanic, I'm going to excuse them. If an African-American comes in with a distrust of the police and will not listen to a police officer and says he will not listen to a police officer, that isn't a challenge based on that person's race or ethnicity; it's a challenge based on that person's personal views.

"If a white—a Caucasian person came in and said, I don't like being followed by the cops because I see a number of cops punch friends of mine in the face, it's not because he is a Caucasian, it's because of life's experiences. And I think that's what I would be arguing, that the comments that were made were not because of his ethnicity or his race, but rather his—his expressed opinions. And I think it's a distinction, I think it's a legitimate distinction, but I defer to Your Honor with respect to this."

After argument by counsel, the court orally denied the *Batson* challenge, stating: "I do think that in both situations it's an issue with regard to negative contact with the police and that, I believe, has been found to be a legitimate race neutral reason for exercising the peremptory challenge. So, under all the circumstances, I am going to find that the state has given a race neutral reason for exercising a peremptory challenge in this case. And I'm going to overrule the *Batson* challenge." Throughout the remainder of the voir dire process, the state asked a uniform set of questions of all jurors. Furthermore, three African-American jurors were selected to serve in this case—two as regular jurors and one as an alternate juror.

Following the filing of this appeal, the defendant filed with this court a motion for articulation, which was referred to the trial court pursuant to Practice Book § 66-5. The trial court granted the motion and in a memorandum concluded that all of the reasons set forth by the state in exercising its peremptory challenge were race neutral.

On appeal, the defendant claims that the court improperly denied his *Batson* challenge to the state's use of its peremptory challenge with respect to W.T. because the state's reasons were not race neutral. We are not persuaded by the defendant's claim.

Our Supreme Court in *State* v. *Edwards*, 314 Conn. 465, 483–90, 102 A.3d 52 (2014), recently reviewed Connecticut's jury selection process and the contours of *Batson* challenges to the state's use of its peremptory challenges: "Voir dire plays a critical function in assuring the criminal defendant that his [or her] [s]ixth [a]mendment right to an impartial jury will be honored. . . . Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. . . . Our constitutional and statutory law permit each party, typically through his or her attorney, to question each prospective juror individually, outside the presence of other prospective jurors, to determine [his or her] fitness to serve on the jury. Conn. Const., art. I, § 19; General Statutes § 54-82f; Practice Book [§ 42-12]. . . . Because the purpose of voir dire is to discover if there is any likelihood that some prejudice is in the [prospective] juror's mind [that] will even subconsciously affect his [or her] decision of the case, the party who may be adversely affected should be permitted [to ask] questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case. . . . The purpose of voir dire is to facilitate [the] intelligent exercise of peremptory challenges and to help uncover factors that would dictate disqualification for cause. . . .

"Peremptory challenges are deeply rooted in our nation's jurisprudence and serve as one state-created means to the constitutional end of an impartial jury and a fair trial. . . . [S]uch challenges generally may be based on subjective as well as objective criteria . . . . Nevertheless, [i]n *Batson* [v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)] . . . the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be

tried . . . the [e]qual [p]rotection [c]lause forbids [a party] to challenge potential jurors solely on account of their race . . . .

"Under Connecticut law, a *Batson* inquiry involves three steps. First, a party must assert a *Batson* claim . . . . [Second] the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the [e]qual [p]rotection [c]lause as a matter of law. . . . At this stage, the court does not evaluate the persuasiveness or plausibility of the proffered explanation but, rather, determines only its facial validity—that is, whether the reason on its face, is based on something other than the race of the juror. . . . [See] *Purkett* v. *Elem*, 514 U.S. 765, 767–68, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) ([t]he second step . . . does not demand an explanation that is persuasive, or even plausible) . . . . Thus, even if the [s]tate produces only a frivolous or utterly nonsensical justification for its strike, the case does not end—it merely proceeds to step three. . . .

"In the third step, the burden shifts to the party asserting the *Batson* objection to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . In evaluating pretext, the court must assess the persuasiveness of the proffered explanation and whether the party exercising the challenge was, in fact, motivated by race. . . . Thus, although an improbable explanation might pass muster under the second step, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination at the third stage of the inquiry. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race . . . were asked a question to elicit a particular response that was not asked of other jurors . . . (4) persons with the same or similar characteristics but not the same race . . . as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race . . . .

"In deciding the ultimate issue of discriminatory

intent, the [court] is entitled to assess each explanation *in light of all the other evidence relevant to* [*a party's*] *intent.* The [court] may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . . Ultimately, the party asserting the *Batson* claim carries the . . . burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"This court previously has articulated the standard of review applicable to *Batson* claims without differentiating between the second and third analytical steps, or, at the very least, has not specifically stated the standard applicable to a trial court's determination with respect to the second step. We take this opportunity to clarify the standard of review for *Batson* claims. The second step of the *Batson* inquiry involves a determination of whether the party's proffered explanation is facially race neutral and, thus, is a question of law. . . . Because this inquiry involves a matter of law, we exercise plenary review. . . .

"The third *Batson* step, however, requires the court to determine if the prosecutor's proffered race neutral explanation is pretextual. . . . Deference [to the trial court's findings of credibility] is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations. . . . Whether pretext exists is a factual question, and, therefore, we shall not disturb the trial court's finding unless it is clearly erroneous." (Citations omitted; emphasis added; footnotes omitted; internal quotation marks omitted.) *State* v. *Edwards*, supra, 314 Conn. 483–90.

The defendant's brief is unclear regarding whether he is challenging the court's resolution of both the second and third *Batson* steps, or whether he is challenging only the court's ultimate factual conclusion that the prosecutor did not act with discriminatory intent in exercising a peremptory challenge with respect to W.T. To the extent that the defendant is arguing that the state's proffered explanation for its use of a peremptory challenge—that W.T. may harbor resentment toward the police or prosecutors, or has concerns regarding the fairness of the criminal justice system as a whole— are not facially neutral, we disagree that such explanations violate the equal protection clause as a matter of law.

Distrust of the police or concerns regarding the fairness of the criminal justice system are viewpoints that may be shared by whites and nonwhites alike. In other words, the prosecutor's questions regarding potential

jurors' attitudes about the police and the criminal justice system are likely to divide jurors into two potential categories: (1) those who have generally positive views about the police and our criminal justice system, and (2) those who have generally negative views of the police or concerns regarding the criminal justice system. See id., 491–92 (prosecutor's explanation for use of peremptory challenge race neutral because it divided jurors into two general categories, either of which may include racial minorities). As in *Edwards*, the prosecutor here also did not refer to race in his explanation except as necessary to respond to the *Batson* challenge.

Indeed, our case law supports the conclusion that such explanations are facially neutral. For example, in *State* v. *King*, 249 Conn. 645, 644–67, 735 A.2d 267 (1999), our Supreme Court upheld the state's use of a peremptory challenge to an African-American juror who expressed "his belief that African-American defendants often receive more sentences than white defendants for the same crimes"; id., 664; on the ground that the venireperson's views "might make it difficult for him to view the state's case with complete objectivity." Id., 666. In *State* v. *Hinton*, 227 Conn. 301, 327, 630 A.2d 593 (1993), the court similarly upheld the use of a peremptory challenge to a potential juror who expressed distrust of the judicial system's treatment of minority defendants. See also *State* v. *Hodge*, 248 Conn. 207, 231, 726 A.2d 531 (resentment or distrust of police and prosecuting authorities legitimate and race neutral bases for use of peremptory challenge), cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999); *United States* v. *Arnold*, 835 F.3d 833, 842 (8th Cir. 2016) ("dissatisfaction with law enforcement by itself was a legitimate reason for the government to strike . . . two jurors").

Furthermore, to the extent that the defendant attempts to advance an argument that resentment of police and distrust of the criminal justice system are not racially neutral justifications for exercising a peremptory challenge because there is a much higher prevalence of such beliefs among African-Americans,[4] such a "disproportionate impact" argument is not legally cognizable with respect to our analysis under the second step of the *Batson* rubric. A race neutral explanation for purposes of our analysis under step two "means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the *facial validity* of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." (Emphasis added; internal quotation marks omitted.) *State* v. *Hinton*, supra, 227 Conn. 324.

"In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges

are true, the challenges violate the [e]qual [p]rotection [c]lause as a matter of law. A court addressing this issue must keep in mind the fundamental principle that official action will not be held unconstitutional *solely because it results in a racially disproportionate impact.* . . . Proof of racially discriminatory intent or purpose is required to show a violation of the [e]qual [p]rotection [c]lause. . . . Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." (Emphasis added; internal quotation marks omitted.) Id. Any disproportionate impact argument is more appropriately confined to step three, the rationale for such argument being that the proffered explanation, even if neutral on its face, applies disproportionately to a particular protected class and is invoked solely as a pretext for excluding that class from the jury. See *State* v. *Edwards*, supra, 314 Conn. 479 (noting disproportionate impact arguments recognized as factor establishing pretext in *Batson* hearing).

On the basis of our plenary review of the record, and considering the present state of the case law, we conclude that the state in the present case advanced a plausible and, on its face, race neutral explanation for its having exercised a peremptory challenge with respect to W.T. We, thus, turn our attention to the third step of the *Batson* analysis, namely, whether the court's ultimate factual conclusion—that the prosecutor did not act with discriminatory intent in exercising the peremptory challenge against W.T.—is clearly erroneous.

In challenging the court's rejection of his *Batson* challenge, the defendant does not appear to argue that due consideration of any of the six factors enumerated by our Supreme Court in *Edwards* would weigh in favor of his assertion that the prosecutor acted with any discriminatory intent. Although the ultimate determination of whether a discriminatory intent was the basis for exercising a peremptory strike depends on " 'an aggregate assessment of all the circumstances' "; *State* v. *Hodge*, supra, 248 Conn. 223; it is significant that, in the present case, all of the *Edwards* factors support the court's conclusion that the state properly exercised its right to use a peremptory challenge with regard to W.T.

First, the state's reasons for excluding W.T. were his stated distrust of police and the criminal justice system, which clearly related to the trial of this case because it is a criminal proceeding in which police would provide significant evidence. Second, the state did not exercise its peremptory challenge without questioning W.T., but rather engaged in a detailed discussion with W.T. about

the views he had expressed in response to defense counsel's questions. Third, the defendant concedes, and our review of the record confirms, that the state asked a relatively uniform set of questions of all jurors. Accordingly, W.T. and the other African-American venirepersons were not asked questions that were not asked of other jurors or that sought to elicit a particular response. Fourth, we are unaware of any venireperson of a race different from W.T.'s, who expressed the same or similar views regarding police and the criminal justice system as those of W.T., but, nevertheless, was permitted to serve on the defendant's jury. Fifth, the state did not advance any explanation that was based on an inapplicable group trait. Finally, and perhaps most significantly, the state did not use a disproportionate number of peremptory challenges to exclude African-Americans from the jury. In fact, as the defendant acknowledges, three African-Americans were selected to serve, two as regular jurors and one as an alternate. Although the racial composition of an empaneled jury certainly is not dispositive of the issue of impermissible motive for use of a peremptory strike as to a particular juror, it is among the various factors that a reviewing court can consider in evaluating whether the explanation for exercising a peremptory challenge is pretextual and, thus, constitutionally infirm. *State* v. *Hinton*, supra, 227 Conn. 332.

The primary argument advanced by the defendant in support of his *Batson* claim is that distrust of the criminal justice system and fear of being stopped by police is "a real fear among probably the majority of the African-American people" and that if the court were to accept the expression of such concerns as a racially neutral ground for excluding venirepersons, this reason could be used as a pretext to challenge a large proportion of African-American venirepersons. The defendant urges this court to modify the holding in *King* that a venireperson's expressed fear of police is a race neutral ground for exercising a peremptory challenge. Even if we were inclined to do so, we are compelled to decline this invitation for at least two reasons.

First, *King* is a decision of our Supreme Court, which this court cannot modify and must follow as binding precedent. See *Stuart* v. *Stuart*, 297 Conn. 26, 45–46, 996 A.2d 259 (2010) ("it is manifest to our hierarchical judicial system that this court has the final say on matters of Connecticut law and that the Appellate Court and Superior Court are bound by our precedent"). We recognize, of course, that the defendant is required to make this claim in order to preserve it for further appellate review.[5]

Second, the defendant is correct that W.T. indicated during his voir dire testimony that, despite his expressed concerns and fears, he believed that he could follow the court's instructions and act as an impartial

juror. The state was not required, however, simply to accept those reassurances at face value. Rather, a prosecutor is "entitled to rely on his or her own experience, judgment and intuition in such matters." *State* v. *Hodge*, supra, 248 Conn. 231. "A venireperson's assessment of his own prejudices may be untrustworthy for a variety of reasons. For instance, he may be lying in an effort to be chosen for the jury, embarrassed to reveal unsavory truths publicly or simply unaware of the existence of bias. Through subtle questioning and scrutiny of body language during the jury selection process, counsel may uncover subconscious prejudice even in the face of an outright denial of prejudice by the venireperson." *State* v. *Smith*, 222 Conn. 1, 14–15, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992).

On the basis of our careful scrutiny of the record, we conclude that the defendant has not demonstrated that the court made an erroneous factual finding that the explanation offered by the state was neither insufficient nor pretextual. In sum, we conclude that the court properly determined that the state's use of its peremptory challenge to exclude W.T. from the jury was not tainted by purposeful racial discrimination, and, therefore, it properly denied the defendant's *Batson* challenge.

## II

The defendant next claims that the court improperly admitted a tape-recorded statement of a witness, Melvin Simmons, pursuant to *State* v. *Whelan*, supra, 200 Conn. 753.[6] The police had identified Simmons as having been around the defendant during much of the evening preceding the defendant's arrest. Although Simmons never gave a formal written statement to the police, he was interviewed prior to trial. The officer who conducted that interview prepared a report. Later, he contacted Simmons by telephone to review the report with him, the contents of which Simmons verbally acknowledged and affirmed. That telephone conversation was recorded by the officer. After Simmons testified at trial that he did not remember any specifics regarding the events in question, the state sought to introduce the tape recording as a prior inconsistent statement under *Whelan*.

The defendant argues on appeal that the court should not have admitted the tape recording because it lacked the necessary indicia of reliability, it was not inconsistent with Simmons' trial testimony, and the defendant was deprived of an opportunity to engage in any meaningful cross-examination. The state responds that the tape recording was properly admitted under the *Whelan* hearsay exception, and even if it was not, the defendant has failed to demonstrate on appeal how the admission of the tape could have affected the result of the trial. Because the defendant has failed to adequately brief how he was prejudiced by the court's allegedly erroneous evidentiary ruling, we deem the claim abandoned

and decline to address its merits.

"[T]he admissibility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan*, is a matter within the . . . discretion of the trial court. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Simpson*, 286 Conn. 634, 643, 945 A.2d 449 (2008). "Additionally, it is well settled that even if the evidence was improperly admitted, the [party opposing its admission] must also establish that the ruling was harmful and likely to affect the result of the trial." (Internal quotation marks omitted.) *State* v. *Vidro*, 71 Conn. App. 89, 98, 800 A.2d 661, cert. denied, 261 Conn. 935, 806 A.2d 1070 (2002). "In nonconstitutional claims, the defendant has the burden of demonstrating the harmfulness of the claimed error. . . . He must show that it is more probable than not that the claimed error affected the verdict." Id. A challenge to the admission of a prior inconsistent statement for substantive purposes under the *Whelan* exception to the hearsay rule is not of constitutional magnitude. *State* v. *Hannah*, 104 Conn. App. 710, 721, 935 A.2d 645 (2007), cert. denied, 285 Conn. 916, 943 A.2d 475 (2008).

"[W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Internal quotation marks omitted.) *State* v. *Toro*, 172 Conn. App. 810, 817, 162 A.3d 63 (2017).

If the defendant fails to address in his principal brief on appeal how he purportedly was harmed by an allegedly improper evidentiary ruling, we will not reach the merits of the evidentiary claim. Id., 817–18. "[W]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where the parties cite no law and provide no analysis of their claims, we do not review such claims." (Internal quotation marks omitted.) *State* v. *Davila*, 75 Conn. App. 432, 441 n.6, 816 A.2d 673, cert. denied, 264 Conn. 909, 826 A.2d 180 (2003), cert. denied, 543 U.S. 897, 125 S. Ct. 92, 160 L. Ed. 2d 166 (2004).

In his brief in the present case, the defendant addresses and analyzes only whether the tape recording at issue should have been admitted under *Whelan*, without any additional discussion or analysis of how that allegedly erroneous admission was harmful to his

defense or may have affected the outcome of the trial. Because the defendant has the burden to show not only that the court's evidentiary ruling was improper, but that he was prejudiced by the adverse ruling, his failure to address the prejudice portion of his claim renders it unreviewable.

## III

Finally, the defendant, relying upon *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), claims that the state improperly infringed upon his constitutional right to remain silent when it cross-examined him at trial about his failure to disclose to the police at the time of his arrest certain exculpatory information that he later testified to at trial. We are not persuaded.

The following additional facts, which the jury reasonably could have found on the basis of the evidence presented, and procedural history are relevant to our resolution of this claim. Detective Matthew Galante of the New London Police Department was among the officers who responded to the Days Inn after learning that the defendant's vehicle had been located there. Galante arrived at about the time the defendant was being apprehended in the parking lot and placed into custody. As he approached the defendant in the parking lot, Galante noticed a female, whom he later learned was the defendant's girlfriend, Sebastian, sitting nearby with another police officer. The defendant, who recognized Galante from prior dealings, asked, "what was up, what was going on with his . . . shorty."[7] Galante first responded by advising the defendant of his *Miranda* rights[8] and asking the defendant if he understood those rights, to which the defendant responded in the affirmative. Galante then asked the defendant what he was asking about his girlfriend.

The defendant told Galante that Sebastian had had nothing to do with whatever had transpired in New London. When Galante asked what he was referring to, the defendant said he didn't know, but also volunteered that, whatever was going on in New London, he also had nothing to do with it. Shortly thereafter, the defendant asked if he could sit in his vehicle because he was cold. Galante told the defendant that the vehicle was part of an active crime scene. The defendant then stated that the police were not going to find a gun in the car, so he should be allowed to wait in there. Eventually, a police cruiser was dispatched to take the defendant to the New London police headquarters. Prior to transportation, Galante advised the defendant that his *Miranda* rights still applied and that Galante would speak with the defendant when Galante returned to headquarters.

At trial, the defendant testified on his own behalf. According to his direct testimony, he admitted to attending an after-hours party on the night of November 11, 2012. He explained that, at about 4 a.m., he had

attempted to break up an altercation and "got jumped." He was beaten up "pretty badly," cut his finger, and was bleeding as a result. He asked his friends to take him to a hospital. He got into his car with Simmons and two other persons, Perkins and Smith. Simmons was driving. On the way to the hospital, the car made a stop at 252 Montauk Avenue. The defendant was told that Silva wanted to discuss the earlier altercation to explain that it was a mistake. The defendant claims that Perkins entered the apartment first and that he and Smith followed. Simmons stayed with the car. The defendant, Perkins and Smith made their way toward the back of the apartment looking for Silva. When the defendant asked where Silva was, he was "[s]hooed out of the room." He went back outside and waited for Simmons, who had apparently left on an errand, to return with his car. When Perkins and Smith returned outside, they got into the car and the defendant told them that "they got to get out. Enough is enough. I'm tired of running around." The defendant never went to a hospital, but instead called Sebastian, picked her up, and went to the Days Inn in Old Saybrook, where he eventually was arrested.

On cross-examination by the state, the defendant acknowledged that he had listened to all of the other witnesses testify at trial and, in particular, heard the testimony that his blood was found throughout the apartment at 252 Montauk Avenue. He also acknowledged that this was the first time he had "told anybody about this story about . . . Perkins going in there . . . ." He admitted that he had spoken with Galante at the Days Inn after he was given his *Miranda* warnings and that he was familiar with Galante from "prior dealings" with him. The prosecutor asked the defendant: "And at that point in time, you didn't tell Detective Galante what you've told us here today after you've listened to all this evidence, have you?" Defense counsel objected to the question, arguing that it came close to violating the defendant's right to remain silent. The prosecutor stated that he believed his question was proper cross-examination because it went to the credibility of the defendant's direct testimony, but that he would try to further focus his inquiry.

The prosecutor then elicited from the defendant that he had never told Galante about getting into a fight earlier in the evening, about going to 252 Montauk Avenue, or anything about Perkins' involvement in the events of that night. Defense counsel renewed his objection. Because cross-examination of the defendant had started near the end of the day, the court dismissed the jury and inquired whether counsel would like to be heard on the objection before the court adjourned for the day. Defense counsel indicated that he would like the state to cite the case that allows this type of questioning. The parties agreed to confer on that issue and suggested that the court could resume hearing argu-

ment the following morning. In the morning, however, defense counsel indicated to the court that after consulting with the prosecutor about the scope of the questions, he now "understood his basis" and was withdrawing his objection.

Cross-examination of the defendant resumed, and upon inquiry, the defendant recounted his asking Galante why Sebastian was being arrested because she had nothing to do with what was going on. He also acknowledged that he never mentioned that he had been "jumped" at the after-hours party or that he had been inside 252 Montauk Avenue with Perkins and Smith. Defense counsel did not object to this line of questioning.

Despite defense counsel's expressly having raised a *Doyle* objection at trial that he subsequently abandoned, the defendant argues that he is entitled to review of his resurrected *Doyle* claim on appeal pursuant to *State v. Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[9] As established in *Golding*, and later modified in *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis omitted; footnote omitted.) *State v. Golding*, supra, 239–40. Although we agree with the defendant that the first two prongs are met here, we conclude that the claim fails on the third prong because the defendant has not demonstrated that a constitutional violation existed that deprived him of a fair trial.

"In *Doyle* . . . the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. The court based its holding [on] two considerations: First, it noted that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value. Second and more important[ly], it observed that while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. . . .

"*Doyle* applies whenever *Miranda* warnings have been given regardless of an arrest or custody. . . .

There are limits, however, to the protection afforded to an accused by *Doyle* and its progeny. *Doyle* does not apply to cross-examination regarding prior inconsistent statements." (Citation omitted; internal quotation marks omitted.) *State* v. *Bell*, 283 Conn. 748, 764–65, 931 A.2d 198 (2007). "Inconsistencies may be shown not only by contradictory statements but also by omissions." *State* v. *Whelan*, supra, 200 Conn. 748 n.4. The court in *Bell* cited to *Anderson* v. *Charles*, 447 U.S. 404, 408, 100 S. Ct. 2180, 65 L. Ed. 2d 222 (1980), which held that questioning regarding prior inconsistent statements "makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all."

In *State* v. *Talton*, 197 Conn. 280, 292–93, 497 A.2d 35 (1985), our Supreme Court noted for purposes of evaluating a claimed *Doyle* violation that there is a distinction between a defendant who remains silent after he is arrested and advised of his rights, and a defendant who, after being given *Miranda* warnings, chooses to forgo such rights. "Once an arrestee has waived his right to remain silent, the *Doyle* rationale is not operative because the arrestee has not remained silent and an explanatory statement assuredly is no longer insolubly ambiguous. By speaking, the defendant has chosen unambiguously not to assert his right to remain silent. He knows that anything he says can and will be used against him and it is manifestly illogical to theorize that he might be choosing not to assert the right to remain silent as to part of his exculpatory story, while invoking that right as to other parts of his story. While a defendant may invoke his right to remain silent at any time, even after he has initially waived his right to remain silent, it does not necessarily follow that he may remain selectively silent." (Internal quotation marks omitted.) Id., 295.

We agree with the state that the defendant has failed to establish that any of the prosecutor's questions during cross-examination of the defendant implicated the concerns expressed in *Doyle*. The defendant in this case voluntarily spoke to Galante after he was in custody and after being advised of his *Miranda* rights. By his own admission, he did not invoke his right to remain silent until after he was transported to the police department. He chose to speak to Galante about the fact that neither he nor Sebastian had anything to do with what happened in New London and that there was no gun in his vehicle. He nevertheless admitted during cross-examination that he never told Galante that he had been in a fight in New London or that he had gone into 252 Montauk Avenue with Smith or Perkins, both facts that he testified to at trial. Rather than impermissibly attempting to impeach the defendant with his choice to remain silent after being informed of his *Miranda*

rights, the state's cross-examination focused on why, having chosen to speak with Galante, the defendant never provided the same exculpatory details that he later testified to at trial. We conclude that the state properly inquired about the defendant's prior inconsistent statement to Galante; see *State* v. *Bell*, supra, 283 Conn. 764–65; and that the inquiry did not violate the rule set forth in *Doyle*. Because the defendant has failed to demonstrate the existence of a constitutional violation, his claim fails to satisfy the third prong of *Golding*.

The judgment is affirmed.

In this opinion BEACH, J., concurred.

[1] The jury found the defendant not guilty of murder, but found him guilty of the lesser included offense of manslaughter in the first degree with a firearm in violation of General Statutes §§ 53a-55 (a) (1) and 53a-55a. The jury also found the defendant guilty of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1). The trial court subsequently vacated the manslaughter and burglary verdicts on the ground that they are lesser included offenses of felony murder and home invasion. See *State* v. Polanco, 308 Conn. 242, 255, 61 A.3d 1084 (2013) (if defendant convicted of greater and lesser included offenses, trial court must vacate conviction of lesser offense rather than merging convictions and vacating sentence for lesser included offense). That determination is not challenged on appeal. The defendant received a total effective sentence of seventy years of incarceration.

[2] According to the defendant's testimony, he first encountered Perkins shortly after the altercation at the after-hours party.

[3] See *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[4] In his brief, the defendant states: "[W.T.] was merely stating a real fear among probably the majority of the African-American people; that of being stopped by the police. If this is to be considered by the courts to be a race neutral reason for exclusion, this reason could be used to challenge a large proportion of the potential African-American . . . venirepersons. Especially with the recent rash of police shootings of minority populations, the defendant would urge this court to modify [the] holding in *King* concerning being afraid of the police as a nonrace neutral reason. Minority populations are genuinely afraid of police, and therefore this is not race neutral."

[5] We are not blind to the reality that African-Americans and other minority groups have disproportionately negative views regarding law enforcement and the criminal justice system as a whole when compared with whites. Although the defendant did not offer any evidence at trial regarding these facts, our review of studies conducted by reputable research firms strongly supports this understanding. For example, in a 2016 study of 4538 United States adults conducted by the Pew Research Center, "[o]nly about a third of blacks but roughly three-quarters of whites say police in their communities do an excellent or good job in using the appropriate force on suspects, treating all racial and ethnic minorities equally and holding officers accountable when misconduct occurs." R. Morin & R. Stepler, Pew Research Center, "The Racial Confidence Gap in Police Performance," (September 29, 2016), p. 1, available at http://www.pewsocialtrends.org/2016/09/29/the-racial-confidence-gap-in-police-performance/ (last visited August 30, 2017) (copy contained in the file of this case in the Appellate Court clerk's office). A 2016 study that aggregated multiple Gallup polls yielded similar evidence: "Fifty-eight percent of whites have confidence in the police, compared with 29% of blacks." F. Newport, Gallup, "Public Opinion Context: Americans, Race and Police," (July 8, 2016), p. 1, available at http://www.gallup.com/opinion/polling-matters/193586/public-opinion-context-americans-race-police.aspx (last visited August 30, 2017) (copy contained in the file of this case in the Appellate Court clerk's office). In the same study, only 28 percent of blacks rate the honesty of police officers as very high or high compared with 60 percent of whites. Id., p. 3. Thus, permitting the use of peremptory challenges with respect to potential jurors who express negative views toward the police or the justice system may well result in a disproportionate exclusion of minorities from our juries, a deeply troubling result.

Moreover, we are also cognizant that "[p]sychological studies suggest that people readily provide a nonracial explanation of their behavior even when race is actually influencing their decision." J. Bellin & J. Semitsu, "Widening *Batson*'s Net to Ensnare More Than the Unapologetically Bigoted or Painfully

Unimaginative Attorney," 96 Cornell L. Rev. 1075, 1102–1103 (2011). Professors Bellin and Semitsu state that "judges . . . inevitably struggle to discredit proffered race-neutral explanations. Any investigation will be unproductive because attorneys not only are hesitant to admit bias but also may not even be aware of their bias." Id., 1104.

We make this point not to suggest that the prosecutor conducting voir dire in this case was motivated by racial bias, but to recognize the need to be particularly vigilant in assessing a prosecutor's use of peremptory challenges, especially if the proffered explanation may have a disproportionate impact on minority participation on juries. As Justice Thurgood Marshall predicted in his concurring opinion in *Batson*, "[a]ny prosecutor can easily assert facially neutral reasons for striking a juror, and trial courts are ill-equipped to second-guess those reasons." *United States* v. *Batson*, supra, 476 U.S. 106. Recently, in *Foster* v. *Chapman*,     U.S.     , 136 S. Ct. 1737, 195 L. Ed. 2d 1 (2016), the United States Supreme Court determined that a *Batson* violation had occurred in that case. *Foster*, however, involved the unusual situation in which the evidence included various markings and notes on the jury venire list used by the prosecutor during jury selection, which the Supreme Court concluded evidenced a clear intent to preclude prospective black jurors, despite the facially neutral explanation advanced by the prosecutor. Id., 1748–55. *Foster*, therefore, is simply not truly representative of a typical *Batson* challenge, which often turns in large part solely upon the court's assessment of the credibility of the party exercising the peremptory challenge. See N. Marder, "*Foster v. Chapman*: A Missed Opportunity for *Batson* and the Peremptory Challenge," 49 Conn. L. Rev. 1137, 1183–85 (May 2017) (discussing why *Batson* challenges are easily evaded by lawyers and difficult for courts to review and advocating for elimination of peremptory challenges because "mere tweaks" to *Batson* test were unlikely to resolve problems).

We share many of the concerns expressed by Judge Lavine in his concurring opinion, but, as an intermediate state appellate court, we are, of course, bound by extensive precedent that limits our ability to remedy the weaknesses inherent in the *Batson* standard. Our cases are clear that disparate impact alone is insufficient to demonstrate a *Batson* violation. Accordingly, as our Supreme Court did in *State* v. *Hinton*, supra, 227 Conn. 330, we are confined to reminding trial courts to be particularly diligent in assessing the use of peremptory challenges in circumstances that, if left unscrutinized for pretext, may result in "an unconstitutionally disparate impact on certain racial groups."

[6] "In *State* v. *Whelan*, supra, 200 Conn. 753 . . . we adopted a hearsay exception allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination. This rule has also been codified in § 8-5 (1) of the Connecticut Code of Evidence . . . . The *Whelan* hearsay exception applies to a relatively narrow category of prior inconsistent statements . . . [and was] carefully limited . . . to those prior statements that carry such substantial indicia of reliability as to warrant their substantive admissibility." (Internal quotation marks omitted.) *State* v. *Bonds*, 172 Conn. App. 108, 128–29, 158 A.3d 826, cert. denied, 326 Conn. 907,     A.3d     (2017).

[7] At trial, Galante testified that, in street lingo, "a shorty is somebody's girlfriend."

[8] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[9] Because the state does not challenge the defendant's assertion that he is entitled to *Golding* review, we will afford his claim that review. Nevertheless, it is important to note that our decision to do so is limited to the particular circumstances of this case. *Golding* review arguably should be unavailable to the defendant because, rather than failing to preserve the *Doyle* claim by not raising it in any fashion before the trial court, the claim here was undeniably raised at trial, but later expressly abandoned by defense counsel, who withdrew the objection before the court ruled on the issue. Because we have determined that he cannot prevail on the merits of his claim, there is no prejudice to the state in engaging in *Golding* review of the defendant's *Doyle* claim and, in doing so, we avoid the more thorny issue of waiver. This case should not be cited, however, for the proposition that an evidentiary claim that a defendant is entitled to *Golding* review in circumstances in which he raised and then expressly abandoned a claim at trial.